UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WESTGATE RESORTS, LTD.; et al.,

     Plaintiffs,

v.                                      Case No. 6:17-cv-1467-Orl-37DCI

MITCHELL REED SUSSMAN; and
MITCHELL REED SUSSMAN &
ASSOCIATES,

     Defendants.
_____

## ORDER

*There is a vague popular belief that lawyers are necessarily dishonest. I say vague, because when we consider to what extent confidence and honors are reposed in and conferred upon lawyers by the people, it appears improbable that their impression of dishonesty is very distinct and vivid. Yet the impression is common, almost universal. Let no young man choosing the law for a calling for a moment yield to the popular belief – resolve to be honest at all events; and if in your own judgment you cannot resolve to be an honest lawyer, resolve to be honest without being a lawyer. Choose some other occupation, rather than one in the choosing of which you do, in advance, consent to be a knave.*[1]

This case is about whether a lawyer's practices are necessarily dishonest.

Defendant Mitchell Reed Sussman is a California-based real estate attorney who claims a

specialty in ridding timeshare owners of their timeshare obligations. He does this by

directing timeshare owners to stop all payments to their timeshare, sending demand

letters to the timeshare company, and recording another owner on the property deed—

---

[1] Abraham Lincoln, *Collected Works of Abraham Lincoln: Volume 2* 82 (Roy P. Basler ed. 1953).

all for a fee, of course. At the end of the day, he tells the timeshare owners they got off scot-free thanks to his skillful negotiation tactics and ability to drive a hard bargain. But, alas, it's not so. Rather, from the timeshare company's perspective—Plaintiffs Westgate Resorts, Ltd., et al. (collectively, "**Westgate**")—and contractually, the owners' obligations are undiminished. Despite this inconvenient truth, Mr. Sussman kept on.

Now, burned too many times, Westgate sues Mr. Sussman and his law firm (collectively, "**Mr. Sussman**") to permanently enjoin these practices and to recoup the money it lost from unpaid fees. As it stands, Westgate brings two claims against Sussman: (1) tortious interference with existing contracts; and (2) violating Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**"). (Doc. 7, ¶¶ 90–100, 112–118.) To describe the litigation as "red in tooth and claw" would understate its contentious nature. Following discovery wars that resulted in sanctions deeming certain facts admitted (Doc. 128), the parties filed cross-motions for summary judgment (Docs. 184, 185). This Order follows.

## I.    BACKGROUND

Faced with a rat's nest of a record, the Court plunges in to deliver this (regrettably lengthy) summation of the facts at issue.[2] The Court focuses on the three key players: Westgate (The Trapper), Mr. Sussman (The Weasel), and Westgate owners (The Prey).

---

[2] For the purpose of resolving a summary judgment motion, the Court presents the facts in the light most favorable to the non-moving party. *See Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Here, both parties move for summary judgment on certain material facts that are undisputed—rather, they dispute the inferences to be drawn from those facts. Therefore, this section presents the undisputed facts from the record that form the basis of the Court's ruling. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). The Court notes that it has considered the full record, including materials not specifically appended to the summary judgment motions and cited herein.

## A.    Westgate (The Allegorical Trapper)

Westgate is in the business of selling timeshares. (Doc. 123-1, p. 10:7–8.) With resorts in many states, Westgate's primary product is one week of usage rights in a specific type of unit—a deed-based system, not points-based like other timeshare companies. (*Id.* at 10:9–20.)

Buying a timeshare is an involved process. Generally speaking, it starts with prospective buyers attending timeshare presentations and hearing a sales pitch by a Westgate salesperson. (*Id.* at 19:8–21:20.) Attendees are given a tour, asked questions about themselves and their vacation habits, and told about the benefits of owning a Westgate timeshare. (*See id.*) If they agree to purchase, a proposal is prepared by the sales staff that includes information about the terms of ownership. (*Id.* at 21:22–22:4.) Buyers sign a contract for purchase and sale and a **Declaration** of covenants, conditions, and restrictions for the resort, which outlines their rights and obligations as owners. (*Id.* at 32:22–37:3, 51:17–24; Doc. 185-8.)

To purchase a unit, buyers can pay outright or finance via mortgage, usually procured through Westgate to be paid in monthly installments. (Doc. 123-1, pp. 9:21–10:6, 23:10–16, 29:14–24.) A warranty deed is then prepared to transfer the timeshare interest from Westgate to the owner at the time it's recorded. (*Id.* at 24:2–23.) Once transferred, owners must make annual payments to their resort's homeowners association ("**HOA**")—"common expenses" such as maintenance fees, real estate taxes, and utility charges. (*Id.* at 66:22–68:1; Doc. 185-8, pp. 23–24.) Each year's amount varies, as it's set by the HOA's Board of Directors. (Docs. 123-1, pp. 111:9–10, 112:5–12; 185-8, pp. 19–21).

Failure to pay can result in various penalties and fines levied against the owner, including additional assessments, a lien placed on the account, forfeiture of the unit, and litigation to recover owed amounts. (Doc. 185-8, pp. 19–23.) Liability for these common expenses extends to successors in interest. (*Id.* at 20–21.)

Divesting timeshare ownership from Westgate, as with any self-respecting snare, is complicated, as an owner's options are limited. Under the Declaration, an owner may sell or transfer his unit. (*Id.* at 38–39.) But before doing so, the owner must honor Westgate's **Right of First Refusal**, whereby Westgate has "the option to purchase said Timeshare Interest, upon the same conditions as are offered by the Owner to a third person." (*Id.* at 38.) The process kicks in once an owner finds a buyer for his timeshare. (Doc. 123-1, pp. 51:17–52:15.) Before selling or transferring the timeshare, the owner must notify Westgate and provide documents related to the transaction. (*Id.*) Westgate can request additional documents and "tell that buyer that they have [Westgate's] authority to proceed with the transfer or the sale, or [it] can offer . . . to buy that timeshare week" for the same price. (*Id.* at 52:2–11.) Whether Westgate chooses to exercise its Right of First Refusal "all depends on the price of the inventory and what the demand of the inventory is." (*Id.* at 53:11–19.) And the provision is airtight: "Any attempt to sell [a] Timeshare Interest without waiver of the right of first refusal by the Developer shall be wholly null and void, and shall confer no title or interest whatsoever upon any purchaser." (Doc. 185-8, p. 38.)

Those are the two exit options contemplated by Westgate's Declaration, but an owner can sometimes get rid of her timeshare by negotiating with Westgate. (Doc. 123-1,

pp. 138:23–139:3.) Westgate "negotiate[s] with owners on a case-by-case basis," usually if the owner raises of "some type of hardship." (*Id.* at 139:7–10.) Westgate "has a hardship application and process that [it] asks owners to go through," where the owner provides "documentation of the hardship" to show "their financial situation has changed and they no longer want or no longer can afford the product." (*Id.* at 139:7–19.)

If the claimed hardship is acceptable to Westgate, it "will negotiate a settlement with the customer which will typically involve some type of a fee, and then [Westgate] would accept a warranty deed in lieu of foreclosure." (*Id.*) In short, sometimes begging plus payment will open the trap. Or Westgate refuses to negotiate. (*Id.* at 139:4–6.) If the owner cannot find a buyer and Westgate is unwilling to take back the timeshare, the owner is left with two options: "continue to make payments or [] default." (*Id.* at 140:24–141:24.) With default comes "the possibility of a foreclosure and judgment." (*Id.* at 141:24–142:1.)

Foreclosure can be judicial or non-judicial. (*Id.* at 63:20–64:6.) With judicial foreclosure, Westgate sues the defaulting owner. (*Id.* at 61:11–69:16.) After Westgate obtains judicial foreclosure, it receives the timeshare back to be marketed and sold through "normal sales channels." (*Id.* at 69:25–71:23.) It prices the timeshare "at the same level regardless of whether it came back through foreclosure or any other means." (*Id.* at 123:9–14.) And as for the defaulting owner who still owes money on the mortgage, Westgate decides whether to continue pursuing the mortgage and note. (*Id.* at 142:12–17.)

B.    Mr. Sussman (The Allegorical Weasel)

On estimate, thirty-five percent of Westgate's owners default over the life of their loan. (*Id.* at 128:12–19.) Enter Mr. Sussman. Mr. Sussman is a California-based lawyer who has been practicing real estate law for 41 years. (Doc. 185-2, pp. 12:11–15, 21:16–18.) A solo practitioner, he runs his practice out of three offices in Southern California. (*Id.* at 10:7–23, 19:20–21.) Instead of having full-time employees, he uses 1099 independent contractors who "do a variety of things for [his wife] and [him]," including legal-related work—between six and twenty contractors in a given period. (*Id.* at 16:24–21:18.) Some are lawyers; most aren't. (*Id.* at 18:10–22:17.)

About ten years ago, Mr. Sussman's real estate practice evolved to represent timeshare owners. (*Id.* at 32:3–33:2; Doc. 50, ¶ 4.) He started "suing developers" and was able to "get[] people out." (Doc. 185-2, pp. 67:12–68:16.) For a small fee, he'll open the trap and spring the prey. Apparently he made quite the name for himself, as he was approached by a listing company called Timeshare Exit Team ("**TET**") in 2013 after he'd "already been in the business for about five years." (*Id.*) As a listing company, TET had been focusing on the secondary market for timeshares, listing "for sale a timeshare from an owner who didn't want to own it." (*Id.* at 68:7–9.) That approach was a dud—the value of a timeshare in the secondary market is "little or none"—so TET looked to change its business model. (*Id.* at 68:7–14.) TET went to Mr. Sussman because it "did not know how to dispose of the[] files that [it] already had." (*Id.* at 86:8–16.) TET then "morphed" into an exit company and hired Mr. Sussman to "handle" its client files and "advise and consult with them regarding methods and techniques that [he] had already developed

regarding exiting people or canceling timeshares." (*Id.* at 68:17–69:18, 85:14–20.) In this arrangement, TET communicated with timeshare owners, while Mr. Sussman communicated with the developer. (*Id.* at 78:23–24.)

Mr. Sussman "pioneered" four discrete methods to exit people from their timeshares. (*Id.* at 69:19–70:23.) First is negotiation—the most preferred—where Mr. Sussman tells the developer that the owner wishes to get out and offers money in exchange for the exit. (*Id.* at 74:13–75:1.) Second is resignation, used for non-deeded timeshares, where Mr. Sussman sends a "notice of resignation" on behalf of the owner "stating that the particular owner no longer wishes to be a member of the club." (*Id.* at 75:8–12.) Third is "deed back to the resort." (*Id.* at 93:23–24.) With this method, Mr. Sussman (or a lawyer he hires) prepares a quitclaim deed that conveys an owner's timeshare interest back to the developer. (*Id.* at 101:4–7, 240:9–246:10.) The owner signs the deed, and Mr. Sussman (or the lawyer) records the deed. (*Id.* at 240:9–246:10.) Mr. Sussman then sends the recorded deed back to the owner, with a letter saying the owner has exited his timeshare. (*Id.* at 101:4–102:16.) Fourth is "deed to associate." (*Id.* at 93:25–94:1.) Like the deed back, in this method Mr. Sussman prepares and records a deed that conveys away an owner's timeshare interest, then tells the owner exit has been accomplished once the deed is recorded. (*Id.* at 93:25–94:1, 101:4–102:16, 109:8–113:24.) The only difference is that this time, the grantee listed is one of Mr. Sussman's independent contractors, paid $100 per deed. (*Id.* at 110:1–9, 120:15–18, 128:25–129:12.) No purchase agreement accompanies these deeds. (*Id.* at 128:22–24.)

So those are Mr. Sussman's methods—the Weasel's promise to the ensnared prey—how he guarantees results for dissatisfied timeshare owners. What he does depends on the developer, and when Mr. Sussman first receives a file, he doesn't know which method he'll employ. (*Id.* at 127:12–21.) Thus, all timeshare owners start the same way: his office sends out a form demand letter to the developer. (*Id.* at 50:7–51:9.) Regardless of the owner's circumstances, the letter alleges claims of fraud and misrepresentation against the developer. (*Id.*) It reads:

*Law offices*
*Mitchell Reed Sussman & Associates*

August 8, 2018

**CFI Resorts Management Inc./Westgate**
2801 Old Winter Garden Road
Ocoee, FL 34761
**ATT:  Collections**

**Re: Harrison, Carol and Dennis (Deceased)**
**Westgate Flamingo Bay | Unit 0828 | Week 2**

To Whom it May Concern,

I have been retained by and represent the above – named with
respect to their claims of fraud and misrepresentation in
connection with the time – share presentation and sale.

In light of the foregoing, they have advised me that they will
no longer be making any payments on the timeshare including any
future or past due maintenance assessments.

My clients understand that you have the legal right to foreclose
and take back the property and are willing to allow you to do
so.

Because my clients have no ill will towards your company they
are prepared to execute a "deed in lieu" or other appropriate
document by which my clients will return the timeshare interest
to you without you having to incur the expense of a drawn out
foreclosure proceeding.

As you no doubt are aware the **Florida Not for Profit Corporation
Act 617.0606** permits a member to "resign from membership at any
time."

In addition, any bylaw which restricts this right or makes
withdrawal subject to an organization's approval is invalid.
*American Jurisprudence 2d, Associations and Clubs, 26; Model Non
– Profit Corporation Act 1987, as amended in 2008, section 6.13,
6.20*

### 1053 S. Palm Canyon Dr., Palm Springs, Ca. 92264
### Phone  760 - 325 - 7191 /  760 - 325 – 7258 Fax

*Law offices of*
*Mitchell Reed Sussman & Assoc.*
Page 2

Finally, pursuant to my clients' request, please forward all
future communications regarding the above referenced time –
share to my attention as follows: **Mitchell Reed Sussman,
Attorney at Law, 1053 S. Palm Canyon Dr., Palm Springs, Ca.
92264 – Telephone 760 – 325 – 7191**

Moreover, both the **Federal Fair Debt Collection Practices Act 15
USC 1692c** and **California's Fair Debt Collection Practices Act**,
in particular **Civil Code 1788.14 (c)** prohibits communications,
other than statements of account with the debtor with regard to
a consumer debt, when the debt collector has been previously
notified in writing by the debtor's attorney that the debtor is
represented by such attorney with respect to the consumer debt.

You are hereby notified not to contact by phone, mail or
initiate any communication with my clients, other than
statements of account.

Please contact me at your earliest convenience so that we may
discuss the proposed a deed – in – lieu or other appropriate
documentation which will return the timeshare interest to you.

Very truly yours,
**Law offices of**
**Mitchell Reed Sussman**
*Mitchell Reed Sussman*
Mitchell Reed Sussman

**About our firm:** *Mitchell Reed Sussman is an attorney at law who has been licensed by
the state of California since 1977. He maintains offices in Palm Springs, Beverly
Hills & Newport Beach and is authorized to practice law before all the courts of the
State of California.*

## 1053 S. Palm Canyon Dr., Palm Springs, Ca. 92264
## Phone  760 - 325 - 7191 /  760 - 325 – 7258 Fax

(Doc. 185-4.)

The letter states that the timeshare owners "have advised [Mr. Sussman] that they will no longer be making any payments on the timeshare[,] including any future or past due maintenance assessments." (*Id.*) However, most owners Mr. Sussman "represents" come to him via exit companies, so he never speaks to them directly. (Doc. 185-2, pp. 60:22–61:14, 100:5–18.) These owners don't know who Mr. Sussman is, that he's working for the exit company, or that he sends this letter on their behalf. (*Id.* at 38:19–40:12.) They also aren't told what exit method Mr. Sussman will use because he himself "[has] no idea at the outset what the method is going to be." (*Id.* at 273:12–18.) So when issues with Mr. Sussman's methods crop up, the owners' only recourse is to tell the exit company, who relays the message to Mr. Sussman. (*Id.* at 38:19–40:12, 48:7–49:21.) Like a game of telephone, Mr. Sussman then responds to the exit company with directions on how to respond to the owner. (*Id.*; *see, e.g.*, Doc. 137-6, p. 5.) Somehow through all of this, exit companies direct owners to stop all payments to their timeshare as part of the cancellation process. (Doc. 185-2, pp. 81:3–16, 100:5–18, 107:11–108:13, 144:15–22.) And Mr. Sussman has been the source of that instruction, as this e-mail exchange with an exit company representative shows:

On Tue, May 10, 2016 at 4:41 PM, Mitchell Sussman <raventv1@aol.com> wrote:

Better for client to send certified mail return receipt saying the following

1. I will not pay another penny
2. I dispute the validity of this debt
3. do not call me again
4. I have an atotorney
5. call and wirte him
6. his name and phone number are

.

Mitchell Reed Sussman
Attorney at Law

www.losangelesrealestateattorney.com
www.palmspringslitigationattorney.com
www.timesharelegalaction.com

-----Original Message-----
From: Casey Toland <casey@trashyourtimeshare.com>
To: raventv1 <raventv1@aol.com>
Sent: Tue, May 10, 2016 3:38 pm
Subject: Re: Scott Stressman's Documents

Scott is continuing to receive phone calls and letters. Can we issue another cease and desist?

Thank you in advance.

(Doc. 137-6, p. 5.) As for owners who come to Mr. Sussman directly, not through exit

companies, he instructs them to stop paying immediately on retention:

On 08/17/15, Mitchell Sussman<raventv1@aol.com> wrote:

1. My fee is all inclusive ...there will be no other charges
2. You are not to pay another penny for maintenance, mortgage or anything else.

Mitchell Reed Sussman

Sent from iPod

On Aug 16, 2015, at 9:04 PM, victor.harris82@verizon.net wrote:

Mitchell a couple of questions;

1. Once we pay the retainer fee are there any other fees required to finish this effort?  Like any transfer fees or anything else we would have to pay to your office or any other entity?
2. Do we continue to pay the monthly payments on the remaining balance of the one timeshare we still have a mortgage on?

(*Id.* at 10; *see infra* Part I.E.4 (Aviles).) Together these two acts—owners stopping payments and Mr. Sussman sending the demand letter—form the first step in Mr. Sussman's exit process.

The next step varies based on the developer—some apparently accede to this entreaty and let owners out, but others don't. (Doc. 185-2, pp 74:17–75:1, 97:24–99:8.) Westgate is the latter. It categorically rebuffs Mr. Sussman's cancellation methods by refusing to negotiate, rejecting his Notices of Resignation, and disavowing both deed methods. (*Id.* at 99:11–100:2.) Mr. Sussman knows this but soldiers on with these methods, telling owners they've successfully exited their timeshares as a result. (*Id.* at 97:24–98:1, 99:11–100:4.) He sends the owner one of three forms congratulatory letter, depending on the method he used. (Docs. 185-5, p. 5 (resignation); 137-2 (deed back); 185-7 (deed to associate).)

For the resignation method, Mr. Sussman writes:

> On April 15, 2017, this office effectively terminated your interest in your time - share the result of which is that you are no longer the owner of the aforementioned time-share.
>
> The aforementioned termination of your time - share interest was as a result of the **NOTICE OF RESIGNATION** sent to the vacation club forever terminating your membership pursuant to the United States Supreme Court decision <u>Booster Lodge No. 405, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. N. L. R. B., 412 U.S. 84, 93 S. Ct. 1961, 36 L. Ed. 2d 764 (1973)</u>
>
> As a result, your time-share has been cancelled and you will have **no further personal obligation to pay future maintenance obligations**
>
> Going forward for all intents and purpose your time-share ownership and any *future personal liability* to your time-share is now at an end.
>
> Furthermore, should you receive any communication regarding the timeshare, please contact our office so we can intercede on your behalf.

(Doc. 185-5, p. 5.) For deed backs and deeds to associates, he writes:

```
Please find enclosed the documents transferring your timeshare
from Westgate Town Center.

Since you are no longer the owner, you are not responsible for
future fees in connection with the timeshare.

I suggest that you keep copies of the enclosed documents for
your records.

This closes my file and CONGRATULATIONS!
```

(Docs. 185-7 (deed to associate); 137-2 (deed back).)

Sending this letter is Mr. Sussman's last step—he washes his hands clean thereafter. (Doc. 185-2, pp. 271:17–272:12.) Should trouble follow—such as an owner being told they still owe money to Westgate, Westgate seeking foreclosure, or Westgate suing the owner—Mr. Sussman is long gone. (*Id.* at 77:20–78:18, 105:6–106:7.) As his retainer "clearly" states, he "will not represent them if there is a lawsuit." (*Id.* at 77:25–78:1.) The most he'll do, if the owner retained him directly and asks, is refund his fee. (*Id.* at 78:11–14.) The Weasel wants no part of the Trapper.

## C.   Westgate's Responses to Mr. Sussman's Methods

Now, Mr. Sussman may skive off after sending his notices of resignation or deeds, but for Westgate, things are just getting started. Westgate considers all of Mr. Sussman's acts bluster—so in terms of ownership and obligations, nothing has changed on Westgate's end. The owner still owns the timeshare and remains contractually obliged. Only now, the owner is deeply in the red and subject to foreclosure—which Westgate

initiates. (*E.g.*, Doc. 123-4.) Indeed, Westgate has battled Mr. Sussman at every step of his process, as these letters show:

First, in response to Mr. Sussman's demand letter, it has said:

> Dear Mr. Sussman,
>
> Westgate Resorts is in receipt of your correspondence regarding your clients' complaint and request to be released from their contract. Please be advised that their account has been reviewed by Westgate's corporate Attorneys, and no wrong doing was found.
>
> Westgate's position is that this account is in good standing; therefore, we respectfully decline your request and will update their account accordingly.

(Doc. 185-10.) When that didn't work, Westgate (through counsel at Greenspoon Marder) responded via letter "reject[ing] [Mr. Sussman's] clients' demands to cancel their respective accounts with Westgate" for these reasons:

> In your letters, each and every one of your clients notifies Westgate that they will immediately default on their financial obligations to Westgate, including their obligation to pay maintenance and tax payments, due to their "claims of fraud and misrepresentation in connection with the time-share presentation and sale." Westgate denies their allegations. As you know, claims of fraud must be pled with particularity. Westgate will not entertain form cancellation letters that are wholly lacking any specific factual or legal basis. All future form letters from your office, which lack any particularity as to the basis for the claims of fraud, will be met with the same response.
>
> Second, as addressed exhaustively in my previous letters, in regard to Florida Statute § 617.0606, Westgate denies this statute or Chapter 617 is applicable to its Florida timeshare properties' homeowners' associations. It certainly is not applicable to Westgate's timeshare owners' association located outside of Florida. In addition, § 617.0606 specifically states that a resignation does not relieve a member of obligations or commitments made before resignation which would include the terms of your clients' contracts with Westgate, including their obligations to pay mortgage, maintenance and tax payments.
>
> As you know, my clients have started the process of filing lawsuits against your clients. The owners identified in this letter will also be the subject of lawsuits should they choose to default as threatened in your letters. **My clients will seek money judgments, not foreclosures.**
>
> I trust that Westgate's position in this matter is clear. Please contact me if you wish to discuss this matter.

(Doc. 185-11, pp. 33–34.) These two responses are directed at Mr. Sussman's demand

letters, but Westgate also sends letters in response to Mr. Sussman's specific methods. For

the resignation method, Westgate has sent this universal response rejecting it:

December 9, 2015

Mitchell Reed Sussman, Esq.
Mitchell Reed Sussman & Associates
1053 S. Palm Canyon Drive
Palm Springs, CA 92264
Facsmile No.: (760) 325-7258

Re:   Universal Response to All "Notices of Resignation from Vacation Club"

Dear Mr. Sussman:

As you know, this office represents Westgate Resorts, Ltd. and all of its related and affiliated developer and association entities (hereinafter collectively referred to as "Westgate"). Please direct all future correspondence regarding this matter to my attention.

Westgate is in receipt of multiple letters from your office on behalf of multiple clients entitled "Notice of Resignation from Vacation Club." A copy is enclosed herewith for ease of reference. In each and every letter, you state that your clients will "resign and withdraw" from their "vacation club" if Westgate does not respond to your letters within ten (10) days of receipt. You cite to Florida Statute § 617.060 for the legal authority supporting your clients' supposed right to resign or withdraw. As you have been advised on multiple occasions, Section 617.060 does not exist. Second, to the extent you are attempting to cite to Section 617.0606, my clients are timeshare homeowner's association and Chapter 617 is inapplicable to these entities. Third, Chapter 617 is not applicable to vacation clubs. Fourth, my clients are not vacation clubs. Lastly, the Florida Statutes do not apply to timeshare homeowner's associations located outside of Florida. Your office's "Notices of Resignation" are without a legal or factual basis and each and every notice will be rejected by my clients.

You are hereby on notice that **this letter is a universal rejection of all Notices of Resignation previously or subsequently received by my clients from your office.** My clients will not waste their time responding to your frivolous notices and certainly will not cancel your clients' Contracts for Purchase and Sale or otherwise cancel any other financial or legal obligations owed to any Westgate developer or association following any receipt of such notice.

(Doc. 185-11, pp. 35–36.)

-16-

For deeds to associates, Westgate considers this method null and void for failure to comply with its Right of First Refusal:

The Developer is in receipt of correspondence which notified the Developer Tom Stanford acquired title to your timeshare. At the time you purchased your timeshare from the Developer, you agreed to be bound by certain Restrictions and Covenants, including the Right of First Refusal, which are specifically described in the Declaration applicable to your timeshare. The Right of First Refusal provides that prior to the time you sell or transfer your timeshare to a third party, the Developer first has the option to acquire the timeshare under the same conditions offered by you to, or received by you from, third parties.

You are hereby notified the sale or transfer of your timeshare is null and void for failure to comply with the Right of First Refusal prior to the transfer or sale of your timeshare to Tom Stanford. You remain the owner of record and liable for all mortgage, maintenance and tax payments for the timeshare.

Pursuant to the procedures set forth in the Right of First Refusal, the following documents are required to be submitted to the Developer **prior** to any sale or transfer of the timeshare:

    (1)    A copy of the executed purchase agreement between you and Tom Stanford; and

    (2)    All other documents or agreements under which you made any payment of monies to a Mitchell Reed Sussman & Associates, any affiliate of the Mitchell Reed Sussman & Associates or any other party in connection with the sale of transfer of your timeshare to Tom Stanford.

    (3)    A copy of the buyer's photo ID or Driver's License.

The Right of First Refusal specifically entitles the Developer to exercise upon all terms including the consideration offered to you by, or received from, any third party for the sale or transfer of your timeshare.

Please submit a copy of the above-referenced document(s) __within five (5) days__ of your receipt of this letter. Upon receipt, the Developer will elect whether it will exercise or waive its Right of First Refusal as to the sale or transfer of your timeshare to Tom Stanford.

(Doc. 207-26, pp. 3–4.)

For deed backs, Westgate sends this letter:

I am in receipt of correspondence from your office containing a Quitclaim Deed recorded September 22, 2015 in which your clients, Mr. and Mrs. Nguyen, attempt to convey title to their timeshare back to Westgate. Please be advised that Westgate does not accept the deed and it is null and void. The Nguyens remain the owners of record and liable for all financial obligations associated with their timeshare. Certainly you have advised your clients that simply recording a deed to Westgate is not sufficient to convey title unless Westgate accepts the deed. Any further attempts by your office to unilaterally deed timeshares to Westgate will be met with the same response – Westgate will reject the deeds.

I am troubled by the pattern of conduct I see from your office. Westgate owners that have timely paid their financial obligations to Westgate for years suddenly default after they retain your office. Now you are apparently instructing Westgate owners to deed back their timeshares without Westgate's consent. Upon information and belief, your office, along with other "contracted attorneys" for Nevada National Advertising and Robert Sussman, appear to be engaged in a scheme to tortiously interfere with Westgate's contracts with its owners. Westgate is reviewing its legal remedies and will proceed as appropriate should your office continue to engage in this conduct. As you know, Westgate is already availing itself of its right to seek money judgments against your clients who choose to suddenly default on their contractual obligations to Westgate after retaining your office.

(Doc. 185-11, pp. 3–4.) Beyond this, Westgate has generally sent letters advising Mr.

Sussman that his practices do not comply with Westgate's Right of First Refusal:

Re:   **Westgate's Right of First Refusal**

Dear Mr. Sussman:

As you know, this firm represents Westgate Resorts, Ltd., Westgate Myrtle Beach, LLC, Westgate Lakes, LLC and their related and affiliated entities ("Westgate"). As we discussed on October 13, 2016, it is Westgate's understanding that your law firm is facilitating the transfer and/or sale of Westgate timeshares from your clients (Westgate's owners) to third parties without complying with the procedures set forth in Westgate's Right of First Refusal ("ROFR"). These transfers, including the transfers involving your clients Peter Smith and Henry Tanare, are null and void as discussed below.

The ROFR, which is applicable to certain Westgate timeshare properties,[1] contains the following provisions which are pertinent to this matter:

Should an Owner wish to sell or transfer his Time Share Interest, he shall deliver to the Developer written notice (the "Owner Notice") containing a copy of the executed purchase agreement between buyer and seller, together with all other documents or agreements relating to the transaction, including, but not limited to, any documents pursuant to which Owner is making any payment of consideration to the transferee, any affiliate of the transferee or any other party in connection with the proposed transaction (collectively the "Transaction Documents"), all of which shall be executed subject to the Developer's waiver of its right of first refusal and consent to the sale or transfer. This right of first refusal specifically entitles the Developer to exercise all terms of the Transaction Documents,

---

1 Your owners should refer to the Declaration they were given at the time of sale to determine whether the ROFR is applicable to their timeshare.

whether contained in one agreement or multiple documents, including the right to receive any consideration paid by the Owner as part of the Transaction Documents. The Developer shall have fourteen (14) days from receipt of the Owner Notice to request supplemental information ("Supplemental Information") that it deems necessary in order to fully evaluate the transaction. The Owner shall submit to the Developer, within five (5) days from receipt of any request by the Developer, any Supplemental Information as may be required by the Developer.

Consequently, prior to the sale or transfer of your clients' timeshares to third parties, Westgate has the contractual right, if applicable to the timeshare property, to receive the following information pursuant to its ROFR: (1) the purchase agreement between the Owner and third party buyer and (2) the Transaction Documents which includes any documents by which the Owner is making any payment of consideration to your client, for the transfer of the timeshares. Again, unilateral transfers which do not comply with the ROFR are null and void for failure to comply with Westgate's ROFR and the original Owners remain the Owners of record at Westgate.

I also direct your attention to Florida Statute § 721.17(e) which prohibits "any person from participating in a plan or scheme the purpose of which is to transfer a resale timeshare interest to a third party buyer that the person knows does not have the ability, means or intent to pay all assessments and taxes associated with the timeshare". Westgate will be closely monitoring all transfers associated with your clients to review whether the third party buyers to whom your law firm is transferring the timeshares subsequently default on their maintenance and tax payments to Westgate. In the event these third party buyers default on their maintenance and tax obligations, Westgate will pursue all legal remedies available to it under Section 721.17 and the Florida Deceptive and Unfair Trade Practices Act.

Please also advise your clients they remain liable for their payment obligations under the Promissory Note regardless of whether there is a transfer to a third party. They should refer to their contract documents for the terms and conditions applicable to the assignment of their Notes.

(*Id.* at 5–6.)

With letters unavailing, Westgate took to recording corrective deeds after Mr. Sussman recorded a deed back that Westgate never consented to. (Doc. 185-12, p. 1.) Westgate also recorded notices of non-compliance with its Right of First Refusal (*id.* at 7), and notices of non-acceptance of a recorded deed (Doc. 185-13, p. 3). For the latter, Westgate sends Mr. Sussman a letter rejecting the deed he recorded and advising him that Westgate "never accepted delivery of the Deed . . . and never authorized [him] to record a Warranty Deed naming [Westgate] as the grantee." (*Id.* at 2.) Westgate then informs Mr. Sussman that the deed "is of no legal effect and [his] Clients continue to be

the owner of record of the Timeshare Interval," with a reminder that the owners "still remain personally liable for all amounts due." (*Id.*)

### D.    Mr. Sussman's Rejoinder

In response, Mr. Sussman maintains his struthious ways. Despite Westgate's varied responses, Mr. Sussman contends his methods are foolproof. First, when Westgate answers his form letter by rejecting his demand to let owners exit and continues to issue maintenance fee statements, he ignores it. (Doc. 185-2, pp. 218:18–21, 271:8–272:15.) He considers the maintenance fee statements "trash," throws them away, and doesn't pass the letter on to the owner or exit company. (*Id.* at 197:9–198:2, 218:14–21, 240:2–5.)

Second, when Westgate has rejected Mr. Sussman's resignation method, he views it as "incumbent upon [Westgate] to take whatever legal action they wish to take to invalidate what [he] feel[s] is a valid resignation." (*Id.* at 75:20–24.) So whether the developer accepts the notice makes no difference—to him, this method constitutes a "valid exit." (*See id.* at 75:25–76:9.)

Third, for the unilateral deed backs that Westgate doesn't consent to, Mr. Sussman acknowledges Westgate's Right of First Refusal provision and that Westgate has stated it does "not wish to accept these deeds back." (*Id.* at 101:8–19, 126:1–3.) Still, he prepares such deeds "[b]ecause [he] think[s] their response is not sufficient as a rejection of it." (*Id.* at 102:5–10.) The same goes for Westgate's response to the deeds to associates—he takes the position that he has already offered the property back, consistent with the Right of First Refusal, by stating the client is willing to sign a "deed in lieu" in his form demand letter. (*Id.* at 135:3–22, 204:8–20.) Because Westgate doesn't accept his offer to take back

the timeshare for free, he "infer[s] that to mean that they're not accepting their right of first refusal." (*Id.*) In his mind, Westgate waives its Right of First Refusal by not agreeing to execute the proposed "deed in lieu" mentioned in his form letter, so he need not notify Westgate before deeding a property to his associate for $100. (*Id.* at 141:4–16.)

As for Westgate's recorded notices of non-acceptance and non-compliance with the right of first refusal, Mr. Sussman's posture is unchanged: he doesn't "think they're effective," so doesn't "do anything" in response. (*Id.* at 254:3–18; *see also id.* at 269:14–272:15.) But if Westgate records a deed transferring back the timeshare, Mr. Sussman responds with this letter:

> We are in receipt of your recently recorded deed to the above - name clients and are responding to same.
>
> Please take notice that our clients disavow this transfer and does not accept it nor does our clients wish to be part of your time - share organization.
>
> Please be further advised that as a matter of law, acceptance by the grantee(s) requires that the grantee have an intention to take legal title to the property. Our clients have no such intention.
>
> Should you dispute this question of fact, you are free to seek a declaration of rights in an appropriate court of law.

(Doc. 185-13, p. 1.) So now, since it suits his purpose, it's Mr. Sussman telling Westgate that the grantee must accept transfer for a deed to be valid. (*Compare id., with* Doc. 185-11, pp. 3–4 (Westgate letter to Mr. Sussman).)

Last, when Westgate forecloses, Mr. Sussman views it as a win. (Doc. 185-2, pp. 291:21–294:3.) His response to a notice of foreclosure is to send this congratulatory letter to the owner:

```
Please be informed that your timeshare was recently taken back
as a result of our efforts and by your steadfast refusal to pay.

This is precisely the result we were hoping for, they have
concluded that it is their best interest to agree to take back
their time share and release you from any and all future
liability.

This closes our file.  CONGRATULATIONS !
```

(Doc. 207-32, p. 1.) The letter doesn't mention foreclosure because, to Mr. Sussman, "[owners] don't even understand the nature of these things. [They] are laypeople." (Doc. 185-2, pp. 292:24–293:2.) So instead he phrases it as the developer "agree[ing] to take back their time share"—he sees agreement "by virtue of their conduct" foreclosing. (*Id.* at 293:14–294:3.) He then closes his file, leaving it to the owner to figure out what to do next. (*Id.* at 105:6–25, 329:13–330:1, 344:8–17.)

All in all, Mr. Sussman mostly ignores Westgate's responses as ineffective to undo his valid methods. This doesn't stop Westgate from continuing to seek payments and contacting owners when foreclosures are filed. (*E.g., id.* at 307:19–308:24 (Langleys).) By then, Mr. Sussman is out of the picture, and owners (who still don't know who Mr. Sussman is) contact their exit company demanding refunds. (*Id.*) The exit company then performs clean-up for Mr. Sussman's messes. (*Id.*) Yet there's a limit to tolerance for his obliquity—which TET reached after working with Mr. Sussman for several years. (*Id.* at 86:20–93:4.) Due to repeat issues with Mr. Sussman's methods, TET dropped him as its lawyer. (*Id.*) TET had problems with all of Mr. Sussman's methods outside of negotiation—so resignation, deed backs, and deeds to associates—about each's "validity . . . as an exit strategy." (*Id.*) Because of this, TET instructed Mr. Sussman to undo deeds

where the developer didn't recognize the transfer and stopped sending him files. (*Id.* at 50:3–6, 92:9–93:4, 172:2–12, 189:9–199:9.) The last file he received was early 2016; since then, he has changed no tack, just continued working with other exit companies. (*Id.* at 93:3–14; *see generally* Doc. 206-5, pp. 43:6–44:19, 64:20–69:9 (deposition of Heatherly Mattson who worked with Mr. Sussman starting April 9, 2018; he records deeds).)

Beyond his severed relationship with TET, Mr. Sussman has faced personnel turnover because of his methods, specifically losing Andre Young, one of the Florida attorneys he hired to prepare and record deed backs. (Doc. 185-2, pp. 240:6–252:16.) Their relationship soured after Mr. Young was contacted by Westgate and several timeshare owners, all saying the same thing: Westgate didn't consent to the deed backs. (*Id.*; Doc. 206-2, pp. 41:13–42:14, 45:3–12.) Mr. Young told Mr. Sussman he couldn't prepare deeds without written proof of the timeshare company's authorization and acceptance; Mr. Sussman responded that "he didn't have to have [the developer's] agreement" because the burden was on the timeshare company after these deeds were recorded. (Doc. 206-2, pp. at 57:8–18, 59:24–60:20.) If Mr. Young was "uncomfortable with the procedure," Mr. Sussman told him, "I thank you for your work and we'll hire someone else." (Doc. 185-2, p. 250:14–17.) They parted. (Doc. 112-5, pp. 8, 14.)

These days, Mr. Sussman uses other Florida attorneys like Daniel Stern (Doc. 206-3) and James Klohn (Doc. 206-4) to prepare his deeds. Undaunted, he'll continue to use all methods until he hears otherwise—not from Westgate, owners, or exit companies, but from a Bar Association or similar entity. (Doc. 185-2, p. 290:8–21.)

### E.    Westgate Owners (The Allegorical Prey)

That takes care of Westgate and Mr. Sussman. The Court now turns to the third leg of this triangle: Ensnared timeshare owners lured by the promise of release through the good offices of Mr. Sussman. The owners he represents can be broken down into two types: exit company referrals and individual retainers. For the exit company referrals, Mr. Sussman is the Wizard of Oz, acting behind-the-scenes without the owners' say-so. Referred owners feel the aftermath of his methods though, as these first three stories show. Later you'll hear the experiences of two owners who retained Mr. Sussman directly. Together, these stories crystalize why owners seek cancellation services, what they are told, and how they deal with the fallout that ensues.

### 1.    Kathryn Day

First, Kathryn Day. (Doc. 184-1.) Ms. Day owned a Westgate timeshare in Orlando that she got from her brother and owned for fifteen years. (*Id.* at 8:8–10:14.) In 2014, after getting divorced, she and her ex-husband decided they wanted to get rid of this "last piece of property owned by [them] jointly"—a clean break. (*Id.* at 11:5–16.) She first approached Westgate to see if they would take it back, but they weren't interested. (*Id.* at 77:20–78:4.) So her ex-husband found an exit company, Newton Group Transfers ("**Newton**"), and they signed an agreement on February 18, 2016 for $4,151 to exit the timeshare. (*Id.* at 12:2–14:25, 19:16–24.) Ms. Day thought Newton was simply going to "sell it so that someone else was going to take it over and it wasn't [their] responsibility anymore." (*Id.* at 16:15–25.) They were told the process would take three to six months

total-- they'd be out before the next maintenance fee statement came due. (*Id.* at 22:24–23:5.)

Over the next few months, Ms. Day's ex-husband communicated with Newton for status reports and was assured "things are progressing." (*Id.* at 15:7–15.) But come Fall 2016, nothing had happened. (*Id.*) Ms. Day "started to get concerned that if this didn't wrap up in that year, [they] had maintenance fees that were going to be due in January." (*Id.* at 15:15–24.) She began calling Newton directly. (*Id.*) Newton told Ms. Day it would timely pay the upcoming statement on her behalf because she wasn't to contact Westgate directly as doing so would compromise her cancellation. (*Id.* at 20:10–21:20, 35:10–13.) But Newton didn't pay. (*Id.* at 20:20–22, 35:14–25.) It told her, "don't worry about it, let it go; [Westgate] won't come after that maintenance fee for a while and [Newton will] be wrapped up by then." (*Id.* at 20:22–25.) Ms. Day stood firm. She didn't want her "credit to be at risk" and "kept escalating and escalating it" until Newton finally paid the fees on April 25—over four months late. (*Id.* at 20:25–21:9.)

Meanwhile, Ms. Day had been asked to sign a quitclaim deed conveying her timeshare back to Westgate that Newton told her was connected to a sale. (*Id.* at 36:8–37:17.) By signing this deed, Ms. Day believed that Newton had succeeded in getting rid of her timeshare, as that's what Newton told her. (*Id.* at 37:14–19.) Later, during the maintenance fee scuffle, Newton sent Ms. Day a recorded deed and cover letter to sign and send to Westgate. (*Id.* at 42:9–44:11.) Mailing this, she was told, "will complete the transfer process, and there shouldn't be anything received from the resort." (*Id.* at 44:5–10.) So she did, believing it was the final nail in her timeshare's coffin. (*See id.* at 44:25–6.)

Alas, it was not. Everything unraveled when Ms. Day received notice from Westgate of overdue maintenance fees: "[W]ait a minute, they never asked Westgate if [it] wanted to buy this. They just recorded the deed without asking them." (*Id.* at 40:6–21.) The next few months, Ms. Day went back and forth with Newton searching for answers, with no satisfactory reply. (*Id.* at 39:6–47:1.) So she tracked down the attorney on her quitclaim deed, Andre Young. (*Id.* at 47:2–51:9.) He told her he'd been hired by Mr. Sussman to simply draft and record deeds without contacting the resort. (*Id.* at 55:2–8.) He also advised her "if [Westgate is] not accepting [her transfer] then [she] might have to be careful that [she is] still liable for assessment fees, foreclosures, and attorney fees." (*Id.*)

From there, Ms. Day tried going back to Newton, but it eventually stopped responding. (*Id.* at 56:3–4.) Finally though, Ms. Day got a call from a lawyer who said he was with Mr. Sussman's law firm; he assured her things would be taken care of soon. (*Id.* at 56:5–24.) When that didn't happen, Ms. Day called Mr. Sussman's law firm directly in November and spoke to another attorney. (*Id.* at 57:13–21.) He told her the attorney she previously spoke to no longer worked for Mr. Sussman and he should not have contacted her directly. (*Id.*) Instead, Ms. Day was to call Newton if she needed anything because "[Mr.] Sussman was not allowed to talk to [her] directly." (*Id.*) But Newton "had totally gone dark on [her]," so she called Westgate on December 21, 2017. (*Id.* at 57:25–58:8.)

Westgate told Ms. Day it received a letter that she was being represented by Mr. Sussman and to direct all communication his way. (*Id.* at 53:6–15.) Unbeknownst to Ms. Day, Mr. Sussman's law firm sent a form demand letter to Westgate dated August 7, 2017

-26-

with allegations of fraud and misrepresentation in connection with the timeshare presentation and sale. (*Id.* at 49:21–53:19.) Little matter that Ms. Day never went through a timeshare presentation and sale as she bought the timeshare from her brother. (*Id.* at 50:7–9.) Nor did she raise claims of fraud and misrepresentation, seek to resign from her timeshare, or consent to a deed in lieu of foreclosure. (*Id.* at 50:10–52:17.) Indeed, Ms. Day never saw this letter until her deposition on December 10, 2018. (*Id.* at 49:1–7.) So for Westgate to speak with her directly, Ms. Day had "to send [it] a letter that said ignore that, you can start talking to me." (*Id.* at 6–15.) Essentially, she "had to reverse that process." (*Id.*)

After reversal, she spoke to a specific department at Westgate and explained her situation: she "was stuck," and she "had no control over this. [She] had a deed that wasn't in [her] name anymore for [her] to sell to anybody or try to get out of and [she] had a deed for a timeshare [she] was responsible for that wasn't being acknowledged," all while facing upcoming maintenance fees. (*Id.* at 58:13–59:7.) In response, Westgate placed a hold on Ms. Day's account so she wouldn't have to pay the fees "to see if [they] could work anything out." (*Id.*) To clear up title, Westgate recorded a deed on January 12, 2018 transferring the interest back to Ms. Day. (*Id.* at 92:5–93:3.) She provided additional paperwork, and Westgate "took the property back," effectively ending her ownership of the timeshare. (*Id.* at 59:8–11, 92:5–93:3.) As for Newton and Mr. Sussman, Ms. Day never heard from either again. (*Id.* at 59:12–60:7.)

### 2. Karen Pfeil

Because Ms. Day didn't have a mortgage on her timeshare, the possibility of foreclosure was luckily never on the table. (*Id.* at 90:21–92:2.) Not so for Karen Pfeil, another Westgate owner wooed by an exit company, Reed Hein, in 2015 to get out of her timeshare. (Doc. 184-2, 9:1–13:10.) She owned three timeshares with different resorts and wanted to cancel them all because she wasn't using them to full capacity. (*Id.* at 12:1–18.) So after an in-person meeting, she signed an agreement on May 15, 2015 to pay Reed Hein $16,516 to cancel all three. (*Id.* at 13:4–18:7.) She was told the process would take "nine months to a year, or 12 months to 18 months" and to stop making payments. (*Id.* at 20:4–18.) She was current on payments and "always paid all [her] payments . . . on time." (*Id.* at 24:25–25:6.) Reed Hein then told Ms. Pfeil her case was referred to an attorney to work with the resorts. (*Id.* at 22:8–18.)

On July 17, 2015, Mr. Sussman's law firm sent Westgate its form demand letter that Ms. Pfeil never saw or knew about. (*Id.* at 25:17–26:16.) Almost three years passed where nothing happened: Ms. Pfeil received periodic "generic" status updates from Reed Hein that its attorneys were working on her case. (*Id.* at 23:5–20, 35:20–37:10.) But on March 1, 2018, Mr. Sussman sent Westgate a quitclaim deed on behalf of Ms. Pfeil to convey her timeshare back to Westgate. (*Id.* at 34:14–35:15.) As per usual, this did nothing and Westgate advanced to foreclosure proceedings for Ms. Pfeil's timeshare. (*Id.* at 43:4–7.) It sent a notice of default and intent to foreclose on March 5, 2018 to Ms. Pfeil and to Mr. Sussman stating that Ms. Pfeil was in default for non-payments starting July 4, 2015. (*Id.* at 37:11–19; Doc. 207-32, pp. 2–4.) Ms. Pfeil then received a certificate of sale from

Westgate on September 21 saying that foreclosure was complete. (Doc. 184-2, pp. 40:20–41:11, 43:1–3.)

After her timeshare was foreclosed, Mr. Sussman fired off his congratulations letter stating:

> Please be informed that your timeshare was recently taken back as a result of our efforts and by your steadfast refusal to pay.
> This is precisely the result we were hoping for, they have concluded that it is in their best interest to agree to take back their time share and release you from any and all future liability.
> This closes our file. CONGRATULATIONS !

(Doc. 207-32, p. 1.) The letter attached the March 5 foreclosure notice sent by Westgate. (*Id.* at 2–4.) Ms. Pfeil then received an e-mail on October 18, 2018 from Reed Hein that she had been released from her timeshare. (Doc. 184-2, p. 42:14–18.) This wasn't at all the result she was expecting, as Reed Hein never mentioned the possibility of foreclosure when she paid them, nor did they tell her of adverse consequences to her credit or that she'd receive a 1099 form to report the foreclosure amount when paying her taxes. (*Id.* at 26:25–27:19.) Had she known that the "cancellation" she signed up for meant "foreclosure," she "would have had second and third and fourth thoughts about proceeding with that." (*Id.* at 40:4–7.) She likely "would have just finished . . . paying off the mortgages and kept the properties." (*Id.* at 27:24–28:1.) Or she "could have just stopped making payments and had it foreclosed on without paying somebody a whole lot of money for nothing." (*Id.* at 40:8–11.) When it was all said and done though, Ms. Pfeil didn't even bother requesting a refund; she just tried "to forget about it." (*Id.* at 42:19–21.)

### 3.    Diana Wenz

So that's Ms. Day and Ms. Pfeil.  Diana Wenz charted a third course. She purchased a Westgate timeshare in 2010 through a mortgage. (Doc. 97-20, pp. 7:14–17, 8:16–25.) In 2015, she received a cold call from a company called JR Vacation Consultants ("**JR**"), saying that if she wanted to exit her timeshare, they could get her out in six months. (*Id.* at 9:9–15.) Getting rid of the timeshare had certainly crossed her mind "but [she] wasn't sure how to do it," so she stayed current on all her payments. (*Id.* at 9:3–15.)

When JR called, the representative told Ms. Wenz that for a set fee, JR would get her out of her timeshare. (*Id.* at 10:9–18.) JR would send someone to her house for an in-person consult. (*Id.*) Ms. Wenz agreed, and two representatives came over a few days later. (*Id.* at 10:16–11:17.) Ms. Wenz was told that JR worked with a lawyer to file and process a quitclaim deed that would get her out of the timeshare within six months or she'd get a full refund. (*Id.* at 12:5–21, 14:20–15:1.) She agreed and paid JR $3,500. (*Id.* at 12:22–24.) This was February 2015, so she expected to be out of her timeshare come August 2015. (*Id.* at 18:4–11.) Nothing happened that year. (*Id.* at 17:14–19:23.)

In 2016, Ms. Wenz received a maintenance fee and tax bill from Westgate. (*Id.* at 15:17–18.) She called JR to find out "where are we standing at this"—"should [she] go ahead and pay this, the maintenance fee?" (*Id.* at 20:3–5.) JR responded that it would contact the attorney; JR then called back saying the attorney advised "not to pay it because Westgate would think that [she] was still interested in owning [the timeshare]." (*Id.* at 20:3–9, 21:14–24.) After this, Mr. Sussman sent a form demand letter to Westgate on Ms. Wenz's behalf claiming fraud and misrepresentation in connection with the

timeshare presentation. (*Id.* at 23:20–25:16.) Like Ms. Day and Ms. Pfeil, Ms. Wenz had never seen that letter before her deposition and had asserted no such claims to JR. (*Id.*)

Nothing happened in 2016 that resulted in Ms. Wenz getting out of her timeshare. (*Id.* at 22:23–23:10.) By then, Ms. Wenz's mortgage had been paid off but she still had maintenance obligations. (*Id.* at 26:4–27:7.) So she called JR and requested a refund because the process hadn't concluded within the guaranteed six months. (*Id.* at 27:7–18.) "[A]ll of a sudden, things seemed to progress pretty fast"—JR told her that the process was "almost finished," they're "so close," so don't stop now when the end is near. (*Id.* at 27:17–28:9.) Lo and behold, in January 2017, JR sent Ms. Wenz a quitclaim deed. (*Id.* at 29:10–30:13.) Ms. Wenz signed the deed, got it notarized, and sent it back to JR. (*Id.* at 30:10–31:8.) She was then told the deed had to be recorded, which would "take care of" her ownership. (*Id.* at 31:12–17.)

The next month, Ms. Wenz received a congratulatory letter from Mr. Sussman saying she'd been exited from her timeshare. (*Id.* at 33:24–35:7.) With that came a letter from JR and two enclosures—an original recorded deed that JR instructed Ms. Wenz to send to Westgate and a copy of the deed for Ms. Wenz's records. (*Id.* at 34:25–35:18.) Ms. Wenz sent the original deed and Mr. Sussman's letter to Westgate on February 23, 2017. (*Id.* at 43:8–18.) From all this, Ms. Wenz believed that she had been exited from her timeshare. (*Id.* at 38:8–10.) She even called Westgate a month later to confirm receipt; Westgate told her they got the papers. (*Id.* at 43:19–22.) All seemed well.

A year passed until Ms. Wenz heard differently. In March 2018, Ms. Wenz received a notice from Westgate that it would foreclose on her timeshare and put the property

back in her name. (*Id.* at 43:23–44:22, 46:13–47:9.) Ms. Wenz then called several people to "try[] to figure out how [Westgate] could do that since [she] didn't own it anymore." (*Id.* at 44:1–45:3.) She called Westgate, Westgate's law firm Greenspoon Marder, and Mr. Sussman's office. (*Id.* at 45:1–46:3.) Mr. Sussman's office told her they couldn't speak with her and she must go back to her exit company. (*Id.* at 48:3–49:10.) So she contacted JR "several times" and "left messages, but nobody ever returned [her] call[s]." (*Id.* at 49:14–19.) She then "noticed on the quit claim deed the [name] Mr. Young." (*Id.* at 50:11–12.) Like Ms. Day, Ms. Wenz called Mr. Young. (*Id.* at 51:7–53:1.) He told her he hadn't prepared her deed and no longer worked with Mr. Sussman. (*Id.*) So Ms. Wenz went back to Greenspoon Marder in April 2018. (*Id.* at 53:15–23.) Greenspoon told Ms. Wenz it planned to sue Mr. Sussman on behalf of Westgate and recruited her to testify. (*Id.*)

After all this, Ms. Wenz's timeshare is back in her name and she is exposed to foreclosure proceedings. (*Id.* at 63:7–17.) JR ghosted her and never refunded her money. (*Id.* at 54:19–55:25.) Looking back, had JR not relayed the instruction from its attorney that Ms. Wenz cease paying Westgate, she would have continued to make payments. (*Id.* at 42:22–43:1.)

Taken together, Ms. Day, Ms. Pfeil, and Ms. Wenz represent owners referred to Mr. Sussman through exit companies. Each believed they were being sprung from the time share snare but unwittingly got taken for a ride, conducted by Mr. Sussman. These owners' stories embody the bulk of Mr. Sussman's work—untraceable and fronted through an exit company. Comfortable in his alternative reality, he sticks to his methods: sending demand letters, stopping owners' payments, drafting deeds, and disappearing

when things go south. On the flip side of that coin are these next two owners' stories—

they retained Mr. Sussman directly and show what happens when Mr. Sussman is up

front and out in the open. Turns out, it's the same.

### 4. Edwin Aviles

Mr. Aviles purchased a Westgate timeshare in April 2009, financed with a

mortgage and promissory note. (Doc. 162-2, p. 15:1–15.) He used it for a few years but

experienced financial hardship after becoming unemployed. (*Id.* at 17:21–25.) He decided

he no longer wanted his timeshare so Googled his way to a YouTube video featuring Mr.

Sussman. (*Id.* at 18:4–13, 75:6–19.) He contacted Mr. Sussman, inquiring about his

services. (*Id.* at 18:14–18.) After they talked on the phone, Mr. Sussman sent this e-mail to

Mr. Aviles with his retainer agreement and a quote of $1,495 for his timeshare services:

> Thanks for you interest in my legal services designed to allow you to
> released from any future timeshare obligations.
>
> As discussed in our phone conversation, I  attached my confidential
> Attorney / Client Retainer for your review.
>
> You will note that my retainer has a REFUND POLICY that provides for a
> full refund should you
> not be released from your personal obligations to pay future
> maintenance and/or mortgage obligations under your timeshare
> contract.
>
> Additionally, feel free to click on the below link to my timeshare website if
> you would like more
> information about getting out of your timeshare simply go to my
> website  http://www.timesharelegalaction.com/
>
> If you have any doubts about the success of this program  you will find
> on the website
> letters from  from timeshare owners praising my office for getting their
> timeshare  companies to agree  to  not only take back their timeshare but
> also forgive the remaining loan balances
> and HOA maintenance fees.

(Doc. 137-6, pp. 2–3.) Mr. Sussman asked for Mr. Aviles' timeshare contract, deed, security agreement or mortgage, and latest maintenance statement or document showing his account's status. (*Id.*) Mr. Aviles responded that same day:

> Hello Mitchell,
>
> I have many questions:
>
> I am in NJ and you are in CA and the timeshare is in FL so how does the act of 2004 consumer protection statute vacation and timeshare California business and professions code tie into Florida laws and codes?
>
> Have you had any clients or success with Timeshare members in the Westgate Resort in Kissimmee Florida?
> What are the details of this process?
> How long will this process take?
> Do you handle any and all title transfers? Ownership transfer?
> Will this appear on my credit report?
> Is your service for or foreclosure litigation?
>
> Thanks, Ed

(*Id.* at 2.) Mr. Sussman told Mr. Aviles to call him because "[t]here are too many questions to be answered by email." (*Id.*) Mr. Aviles responded, "Can you answer this much. After the retainer of $1,495 is paid will other charges accumulate in the process?" (*Id.*) Mr. Sussman said, "Absolutely NOT ! [sic] This is an all-inclusive fee." (*Id.* at 1.) Mr. Aviles then asked how long the process would take, to which Mr. Sussman responded:

> Because you have a mortgage ....this is not an
> easy process. I wish I could tell you that I simply
> snap my fingers and the debt goes away.
> But the truth is it typically takes between
> 6 - 12 months.  In that time, of course, you
> are NOT to pay another penny to the
> timeshare.

(*Id.* at 1.) Mr. Aviles deferred the hiring decision because he "wanted to make sure" and do "additional research." (Doc. 162-2, pp. 22:25–23:1.) He kept paying Westgate. (*Id.* at 23:6–18.)

A year later, Mr. Aviles retained Mr. Sussman for $1,500. (*Id.* at 22:13–14, 26:1–5.)

On September 25, 2014, Mr. Sussman sent Mr. Aviles a letter confirming the

representation:

> Now that you are on board, let make it perfectly clear that when
> handled properly time share companies cannot seek deficiency
> judgments against owners like yourself.
>
> What this means is that once we have notified your time share
> company of our retention and the fact that you have no intention
> of paying them any additional fees, that will ultimately
> conclude that it is their best interest to agree to take back
> their time share and release you from any and all future
> liability.

(Doc. 123-5, p. 1.) The letter also said this about Mr. Sussman's process:

> In addition to sending the "cease and desist" my office will be
> contacting your timeshare company for the purpose of negotiating
> your release from your contract obligations by virtue of having
> your time share company accept a deed - in - lieu, which will
> have the net effect of you deeding back the time share to them,
> thereby releasing you of all future obligations.
>
> I should tell you that this process does take some time,
> however, I assure you that ultimately your time share company
> will be left with no other choice but to take back their time
> share.

(*Id.* at 2.) The next day, Mr. Sussman sent a form demand letter to Westgate on Mr. Aviles'

behalf asserting, per usual, claims of fraud and misrepresentation. (Docs. 162-2, pp. 27:5–

28:15; 123-7.) This came as a surprise to Mr. Aviles—he didn't have "any legal defenses

to breach" and wasn't told Mr. Sussman would so assert. (Doc. 112-10, ¶ 6.) But he did

stop making payments. (*Id.* ¶¶ 7–9, 12.) Both Mr. Sussman and his office staff advised the

Aviles "to discontinue all payments to Westgate for the timeshare, including

maintenance fees." (*Id.* ¶ 8.) Mr. Sussman first issued this directive in his 2013 e-mail (*id.*

¶ 7; Doc. 137-6, p. 1), which his staff repeated once Mr. Aviles retained Mr. Sussman, unprompted and before they knew any details about Mr. Aviles' situation and contract. (Doc. 112-10, ¶ 8.) Instead, they told the Aviles "that no more payments were necessary while [Mr.] Sussman's office took action to dispose of the timeshare." (*Id.*) Mr. Sussman "promised that [the Aviles] would not be responsible for any missed note or maintenance fee payment and that [they] would be able to 'walk away' free and clear." (*Id.* ¶ 12.) They believed non-payment would give Westgate "no choice but to foreclose on [their] timeshare," enabling them "to walk away." (*Id.* ¶ 13.)

Fast forward to August 2015, when Mr. Aviles received a deed transferring his timeshare back to Westgate. (Doc. 162-2, pp. 36:16–40:22.) Mr. Sussman explained the deed to Mr. Aviles, and Mr. Aviles' understanding was that Westgate consented to the transfer. (*Id.*) The deed was recorded on October 28, 2015. (*Id.*) Mr. Aviles later received the recorded deed and a letter from Mr. Sussman's office dated November 16, 2015 saying, "Since you are no longer the owner, you are not responsible for future fees in connection with the timeshare," and "This closes my file and congratulations." (*Id.* at 41:18–43:11.)

By then, Westgate sued the Aviles in state court for breach of contract based on their failure to make payments, seeking to recover money damages. *Westgate Towers, LLC v. Edwin G. Aviles & Marylou Fiore Aviles*, 2015-CC-012285-O (Fla. Cir. Ct. Oct. 13, 2015) ("***Aviles* action**"). Shortly thereafter, on November 12, 2015, Mr. Aviles and Mr. Sussman terminated their relationship; Mr. Sussman refunded Mr. Aviles' $1,500 retainer fee, and entered into a settlement agreement. (Doc. 162-2, pp. 45:4–46:18.) The agreement stated:

> **WHEREAS**, the Clients retained Attorney to rid them of their personal obligations in connection with their timeshare and in connection therewith signed a confidential Attorney / Client retainer and paid a fee of **$ 1,500.00** and has performed significant work in connection with the retainer, including but not limited to transferring the timeshare to a third party.
>
> **WHEREAS**, Attorney contends that as of the result of the work performed by Attorney, the Clients do not have to pay the timeshare another penny, ever, and that any of financial obligations in connection with the timeshare were transferred to the new owner. Clients, however, dispute this contention and are concerned that they are still legally obligated to pay on the timeshare. (hereinafter the "Dispute.")

(Doc. 123-6, p. 1.) And under the agreement, "Clients shall forthwith retain an attorney in Florida to represent them in connection with the matter entitled Westgate v. Aviles." (*Id.* at 2.) After research, Mr. Aviles hired the Aaronson law firm to defend him. (Doc. 162-2, p. 50:2–11.) That lawsuit took a year and a half to resolve, concluding March 2017 for $710, and Westgate recording a warranty deed in lieu of foreclosure that transferred Mr. Aviles' timeshare interest back to Westgate.[3] (*Id.* at 53:13–56:22, 82:16–83:7); *Aviles* action, Voluntary Dismissal, March 31, 2017. Since then, Mr. Aviles had no other dealings with Westgate. (Doc. 162-2, p. 56:8–15.)

### 5. Allan Coe

Like Mr. Aviles, Allan Coe reached out directly to Mr. Sussman about getting rid of his Westgate timeshare. (Doc. 162-1, pp. 23:14–24:1.) He and his wife bought a Westgate timeshare in 2007 and after a while, "the maintenance fees were eating [them] alive." (*Id.* at 13:20–14:8, 15:14–25.) In 2010, they asked Westgate to buy it back. (*Id.* at 16:1–18:10.)

---

[3] Westgate separately filed an in rem foreclosure action against the Aviles on September 26, 2016 (Doc. 123-4), but dismissed it without prejudice on October 31, 2016. *See Westgate Towers, LLC v. Vargas, et. al*, 2016-CA-2467-MF (Fla. Cir. Ct. Nov. 1, 2016).

Westgate declined and gave them names of people to contact experienced in the secondary market. (*Id.*) The Coes tried re-selling, hiring at least two companies, but nothing ever came of it. (*Id.* at 21:13–22:10.)

Sometime later, the Coes retained an exit company "out of Scottsdale, Arizona that took money from [them] and disappeared." (*Id.* at 35:6–7.) That company instructed the Coes to cease all payments and had them sign quitclaim deeds. (*Id.* at 35:4–19.) Mr. Coe saw an article about Mr. Sussman's law firm in a newspaper that he'd "been successful in relieving owners of the burden." (*Id.* at 23:14–24:4.) Interest piqued, he called Mr. Sussman's number listed in the article. (*Id.* at 23:14–24:10.) An in-person appointment was arranged to go over the cancellation process. (*Id.* at 24:13–25:22.) The Coes had five timeshares they were interested in getting rid of, so Mr. Sussman's office charged them $4,500 total. (*Id.* at 34:8–12.) Asked at the appointment whether they were making payments, they said, "No." (*Id.* at 45:10–17.)

Mr. Sussman sent a form demand letter to Westgate on the Coes' behalf. (*Id.* at 38:7–49:15.) Westgate's attorney sent a letter to Mr. Sussman in response, rejecting Mr. Sussman's demands and stating, "Westgate is not interested in entering into a business relationship whereby your office deeds back timeshares from Westgate's owners." (*Id.* at 49:23–50:25.) Notwithstanding this letter, Mr. Sussman had the Coes sign a deed transferring their timeshare interest back to Westgate. (*Id.* at 51:13–52:9, 55:12–56:20.) At no point was Mr. Coe informed that Westgate rejected the demand and wasn't interested in a deed back. (*Id.* at 51:1–6.) Rather, Mr. Sussman recorded the deed and sent the Coes a congratulatory letter saying, "Since you are no longer the owner, you are not

responsible for future fees in connection with the timeshare." (*Id.* at 61:9–18.) Based on this, and "[b]ecause nobody is asking [him] for money," Mr. Coe believes he has been relieved of his Westgate timeshare. (*Id.* at 62:21–23, 70:9–14.) Overall, Mr. Coe took no issue with Mr. Sussman's representations to Westgate on his behalf and deferred to his judgment. (*Id.* at 39:21–49:15, 62:9–18.)

As these five owners' stories show, Mr. Sussman employs the same process no matter where the client comes from: he starts with the demand letter and non-payments and ends with recording deeds back to Westgate. As a result, all owners—except Mr. Coe so far—suffered adverse results. Yet this is of no moment to Mr. Sussman, who can't recall the "thousands and thousands of files that [he's] handled in a non-litigation way." (Doc. 185-2, pp. 14–19.) As he nonchalantly puts it, "[t]hey mostly blend together." (*Id.* at 190:13.) All is right in his world, he carries on, business as usual.

### F.    This Action

Well, this lawsuit is Westgate's response. To stop Mr. Sussman from engaging in these methods once and for all, Westgate sued him and his law firm for tortious inference with contracts and business relations and violating FDUTPA. (Doc. 1; *see also* Doc. 7 (amended complaint).) It seeks an injunction and damages for 411 owners identified as represented by Mr. Sussman. (Doc. 185, p. 1.) Mr. Sussman vehemently denies any wrongdoing and asserts a variety of privileges and defenses as cover. (Doc. 41.) His disdain for Westgate is well-illuminated by his conduct during this suit, in discovery and motion practice. (*See* Doc. 128.) Ultimately, Mr. Sussman's obstinate refusal to comply with several Court orders resulted in the imposition of sanctions under Rule

37(b)(2)(A)(i). (*See id.*; Doc. 167 (Court upholding sanctions)). As a consequence, the

following facts have been deemed established for purposes of this action:

- Defendants directed Westgate Owners to immediately stop paying the (1) maintenance fees and property taxes to the Association Plaintiffs as required by the Contracts for Purchase and Sale; and (2) amounts owed to the Developer Plaintiffs as required by the Promissory Notes. This instruction is made without any prompting from the timeshare owners, without reviewing the timeshare owners' Purchase Agreement, Note, or Mortgage, or otherwise conducting any investigation, and without the timeshare owners informing Defendants of any legal defenses they may have. Sussman Law's staff further reiterates the direction to discontinue making payments in follow-up communications with the timeshare owners. (Doc. 7, ¶ 60.)

- Defendants solicit Florida attorneys, such as the Young Law Firm, to record the deeds referenced in the Amended Complaint in Florida on Defendants' or Defendants' clients' behalf. The deeds either purported to transfer timeshare interests back to Plaintiffs but were recorded unilaterally without Plaintiffs' knowledge, authorization, or approval; or purported to transfer title to a third party that never intended to satisfy the payment or other obligations of ownership. (Doc. 7, ¶ 74.)

- Prior to requesting the deeds, Defendants falsely represented to the Florida attorneys that the Timeshare Corporations had accepted the return transfer of ownership. (Doc. 7, ¶ 75.)

- Defendants knew that their representations to the Florida attorneys were false. Defendants had never asked for, nor received, any acknowledgment from Plaintiffs to transfer the deeds, nor did Defendants provide the consideration recited to in the deed to Plaintiffs. (Doc. 7, ¶ 76.)

(Doc. 128, pp. 11–13.)

Towards the end of discovery, Westgate moved for a preliminary injunction. (Doc.

101.) Despite Mr. Sussman's initial opposition (Doc. 122), he pulled a 180 and agreed to

the entry of a preliminary injunction preventing him from: (1) notifying Westgate that an

owner is resigning or disassociating from Westgate with intent to stop paying associated

financial obligations; (2) preparing, instructing the execution of, or recording deeds conveying property to Westgate without Westgate's express consent and acceptance; (3) preparing, instructing the execution of, or recording deeds conveying Westgate timeshares to any person known or reasonably known to not have the present intent and ability to pay associated financial obligations, or without complying with the Right of First Refusal and other transfer requirements; and (4) informing Westgate owners they do not owe legal or financial obligations to Westgate as a result of his methods. (Docs. 192, 192-1.) So, Mr. Sussman "acknowledged that if the Motion had proceeded on its merits, Plaintiffs could prove the elements necessary to obtain preliminary injunctive relief" without admitting those facts for other purposes. (Doc. 192, pp. 1–2.) The Court entered a preliminary injunction accordingly. (Doc. 198.)

Against this backdrop, the parties filed cross-motions for summary judgment. (Docs. 184, 185.) Westgate seeks partial summary judgment on its tortious interference with contracts and FDUTPA claims; alternatively, it asks the Court to find certain facts established for trial. (Doc. 185.) For his part, Mr. Sussman argues that the record evidence supports entering summary judgment in his favor on all issues.[4] (Doc. 184.) Briefing complete (Docs. 206, 207, 212, 213), the matters are ripe.

---

[4] The parties jointly stipulate that summary judgment should be granted in Defendants' favor on Westgate's claim for tortious interference with advantageous business relations (Doc. 7 ¶¶ 101–11). (Doc. 200.)

## II.    LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the

nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

After that deep dive into the record, the Court surfaces to evaluate whether Mr. Sussman tortiously interferes with Westgate owners' contracts and whether he engages in deceptive and unfair trade practices.

### A.   Tortious Interference

First is Westgate's claim that Mr. Sussman's methods of canceling timeshares amount to tortious interference between Westgate's contracts with the owners. Westgate spotlights two sources of interference: (1) directing owners to immediately cease paying all obligations; and (2) recording deeds and telling owners they have successfully exited their timeshares. (Docs. 185, pp. 11–19; 207, pp. 8–13.) Mr. Sussman's kitchen sink response asserts seemingly every defense and privilege under the sun, as surely at least one sticks. (Docs. 184, pp. 6–15; 206, pp. 7–14.) Nope. The Court explains below.

In Florida, the elements of tortious inference with contractual relations are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) absence of any justification or privilege; and (5) damages resulting from the breach. *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1322 (11th Cir. 1998) (citing *Fla. Tel. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)). "Imbedded within these elements is the requirement that the plaintiff establish that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." *Chi. Title Ins. v. Alday-Donalson Title Co. of Fla.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002) (citing *St. John's River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. 5th DCA 2001)).

The first two elements—that Westgate has a contract with these owners, which Mr. Sussman knows about—are not in dispute. (Doc. 206, p. 7.) So the discussion focuses on the others, broken down by type of interference alleged.

### 1. Cessation of Payments

The first type of tortious inference claimed concerns Mr. Sussman's primary step in his cancellation process: his direction that owners stop paying. (Docs. 185, pp. 11–13; 207, pp. 8–13.) The Court begins with whether this amounts to intentional interference.

#### a. Intentional Interference with Owners' Payment Obligations

A third party intentionally interferes with a contract by "influencing, inducing, or coercing one of the parties [to the contract] to . . . breach the contract." *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. 5th DCA 1999) (quoting *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 675 (Fla. 1st DCA 1991)). Westgate claims Mr. Sussman does so by

directing owners to stop paying their contractual obligations as part and parcel of the exit process. (Docs. 185, pp. 11–13; 207, pp. 8–13.) For this, Westgate relies on this fact admitted against Mr. Sussman as a discovery sanction:

> Defendants directed Westgate Owners to immediately stop paying the (1) maintenance fees and property taxes to the Association Plaintiffs as required by the Contracts for Purchase and Sale; and (2) amounts owed to the Developer Plaintiffs as required by the Promissory Notes. This instruction is made without any prompting from the timeshare owners, without reviewing the timeshare owners' Purchase Agreement, Note, or Mortgage, or otherwise conducting any investigation, and without the timeshare owners informing Defendants of any legal defenses they may have. Sussman Law's staff further reiterates the direction to discontinue making payments in follow-up communications with the timeshare owners.

(*See* Docs. 185, pp. 11–13; 207, p. 13; 7, ¶ 60 (admitted fact).) Mr. Sussman bites back that this fact shouldn't apply to owners referred to him through an exit company because he never speaks to these customers.[5] (Doc. 206, pp. 7–9.) Thus, any direction to stop payments came from the exit company, and Mr. Sussman shouldn't be held to account for the exit company's misdeeds. (*Id.*) So, whether this element is met for the majority of owners Mr. Sussman represents depends on the scope of this admitted fact.

The record supports extending this admitted fact to all Westgate owners represented by Mr. Sussman, whether they came to him directly or via exit company referral. For starters, this fact was admitted against Mr. Sussman based on his refusal to turn over, among other things, documents revealing his communications with such exit companies when compelled. (*See* Doc. 128, pp. 2–11.) His obstreperous conduct

---

[5] Mr. Sussman doesn't dispute that this element is met for the owners who retain him directly. As discussed *infra* Part III.A.1.b., he raises other defenses for those owners.

prevented Westgate from digging into his exchanges with these exit companies, both broadly speaking and specifically on this issue of whether Mr. Sussman voiced the command that owners stop paying. (*See id.* at 10–12.) Which, of course, is why this fact was admitted against Mr. Sussman.[6] (*Id.*) Having authored his own misfortune, the Court will not re-write the script. This fact is admitted.

That said, the record also supports this admitted fact. It evinces Mr. Sussman (and his contractors) directing exit company representatives to instruct owners not to pay—not the other way around. (*See* Docs. 137-6, p. 5; 97-20, p. 21:11–24 (Ms. Wenz).)[7] And even though Mr. Sussman is once-removed from the owners because he doesn't talk to them directly, he communicates regularly with the exit companies about owners. (Doc. 185-2, pp. 48:7–50:2.)

What's more, the nature of Mr. Sussman's relationship with these exit companies is ongoing and repetitive—he handles each file the same way, so he need not issue the

---

[6] The Court overruled Mr. Sussman's partial objection (Doc. 144) to this sanction. (Doc. 167.)

[7] Beyond this evidence, Westgate submitted additional relevant evidence unearthed after discovery closed from Mr. Sussman's last-minute document dump. (Docs. 218, 224.) Specifically, Westgate pointed to additional e-mails sent from Mr. Sussman's contractors directing the exit company representative to direct owners not to pay. (*See, e.g.*, Docs. 218-4 ("Instruct [owner] not to pay."); 224-6 ("If client insists on paying, it is impossible for them to ever exit. They should then keep the timeshare."); 224-7 ("What the client needs to do is stop paying the resort anything. . . . Client should not make any further payments . . . .").) Westgate also included an e-mail exchanged with Heatherly Mattson, whose deposition testimony Mr. Sussman relied on to state he (and his contractors) never instructs exit companies to tell clients not to pay. (Doc. 206, p. 8 (citing Doc. 206-5, pp. 31, 96).) In the e-mail, Mr. Sussman's contractor writes, "Client should continue to not pay." (Doc. 218-6, p. 2.)

same instructions not to pay over and over again. They know the drill. (*Id.* at 50:7–51:20, 53:14–55:9.) Like Edgar Bergen's Charlie McCarthy,[8] he both relies on and requires the exit company to speak for him because he doesn't speak to owners directly. (*Id.* at 38:24–39:6, 59:9–18, 60:22–61:2.) Last, Mr. Sussman's role in TET's early days cannot be ignored—TET came to him as a listing company to learn the tricks of his trade and is now "the preeminent company in this field." (*Id.* at 33:3–7, 67:12–70:20.) He signed on to handle TET's files, and TET learned from Mr. Sussman. (*Id.* at 67:12–70:20.) Like Dr. Jekyll, Mr. Sussman spawned his own Mr. Hyde in TET. No serum can transform this reality, and Mr. Sussman cannot absolve himself by claiming no responsibility for TET's directions that clients stop paying as part of the program he "pioneered."

Thus, by directing owners to stop paying, Mr. Sussman intentionally interfered with owners' contractual obligations to Westgate to keep paying. The first disputed element is met. Let's see whether Mr. Sussman's interference was justified or privileged.

### b.    *Justification and Privilege*

In defense of his directions not to pay, Mr. Sussman asserts a litany of excuses, again splitting hairs between exit company referrals and retained individuals. (Doc. 206, pp. 7–10.) Having rejected this distinction, the Court now construes Mr. Sussman's defenses as directed to all owners, knocking out each. (*See id.* at 8 n.8.)

---

[8] Accomplished ventriloquist Edgar Bergen was best known as the "foil" of dummy Charlie McCarthy; together, they hosted popular radio program the *Edgar Bergen-Charlie McCarthy Show* from 1937 to 1957. *See* Encyc. Britannica, *Edgar Bergen* (Feb. 28, 2019), https://www.britannica.com/biography/Edgar-Bergen.

First, Mr. Sussman claims his directions that owners stop paying are privileged because he acted as the exit company's agent or the retained client's attorney.[9] (Doc. 206, pp. 8–9.) Generally, an agent is not liable for the torts of his principal, but Florida law "is well-settled . . . that individual officers and agents of a corporation may be held personally liable for their tortious acts, even if such acts were committed within the scope of their employment."[10] *First Fin. USA, Inc. v. Steinger*, 760 So. 2d 996, 997–98 (Fla. 1st DCA 2000). The same goes for attorneys who "advise[] or assist[] a client to . . . break a

[9] The Court collapses these two defenses because, as Mr. Sussman acknowledges, they turn on the same analysis of whether Mr. Sussman personally acted wrongfully. (*See* Doc. 206, pp. 9–10.)

[10] The Court notes that this type of agency privilege Mr. Sussman claims differs from what is usually brought up in tortious interference claims. *See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1367–68 (M.D. Fla. 2007). That agency privilege applicable to tortious interference claims rests on the premise that "[o]ne cannot tortiously interfere with a contract to which it is a party," so "an agent generally cannot be held liable for tortiously interfering with the contract of its principle because the agent is privileged to act in the best interest of the principle." *Id.* at 1367–68. The principle in this normal scenario is, of course, the party to the contract. *See id.* But here the proposition is flipped because Mr. Sussman (at summary judgment, not in deposition) now claims that he is the agent of the exit company, his principal, even though the exit company acts as the Westgate owner's agent. (Doc. 206, pp. 9–10.) That's to support his new argument that he cannot be liable for an exit company's direction that owners cease payments. (*Id.*)

Before, however, Mr. Sussman seemed to assert the typical agency privilege stated in *Bray* (*see* Doc. 41, p. 4, ¶ 4), whereby Mr. Sussman is an agent of the agent of the principal—word salad, but as he put it in deposition, this is a type of "tripartite relationship whereby the person who [he] pay[s] . . . then hires a lawyer with the money that [he's] paid them to represent [him]." (Doc. 185-2, pp. 202:18–203:4.) That's how he views his relationship with TET "or any of the other third-party entities [that] send [him] money to represent their customers." (*Id.*) On reviewing the record, this earlier alignment makes more sense, but the Court will go with what Mr. Sussman asserts now. Either way, the result is the same, as even an agent asserting privilege from tortious interference because he represents the party to the contract "can be considered a third party to the contract . . . if the agent acts outside the scope of agency or is not acting in the principle's best interests." *Bray*, 527 F. Supp. at 1368 (citations omitted).

contract": they "are not liable to a nonclient for interference with contract . . . if the lawyer acts to advance the client's objectives without using wrongful means." Restatement (Third) of the Law Governing Lawyers § 57(3) (Am. Law. Inst. 2000).[11] False representations and fraudulent misrepresentations render an agent or attorney liable for tortious interference. *First Fin. USA, Inc.*, 760 So. 2d at 998 (collecting cases involving false representations); Restatement (Second) of Torts § 770(b) cmt. c. (Am. Law. Inst. 1979) (fraudulent misrepresentations are "ordinarily are wrongful means of interference and make an interference improper"); *Smith v. Ocean State Bank*, 225 So. 2d 641, 643–44 (Fla. 1st DCA 1976) (noting presence of fraud in intentional interference cases, although "[f]raud is not a necessary element in every [such] action").

Mr. Sussman's instructions that owners stop payments—breach their contracts—are not privileged by his status as the exit company's agent or retained client's attorney. Why? Because the context in which he gives these statements makes them fraudulent. "A representation is fraudulent when, to the knowledge and belief of its utterer, it is false in the sense in which it's intended to be understood by the recipient." Restatement (Second) of Torts § 767 cmt. c. Here, Westgate owners come to Mr. Sussman, directly or via exit company, seeking a legitimate means of exit. *See supra* Part I.E.1.–5. (Owners' stories).

---

[11] "Florida courts have regularly turned to the Restatement (third) for guidance in cases involving the professional obligations of lawyers and law firms." *Canta v. Philip Morris USA, Inc.*, 245 So. 3d 813, 821 n.8 (Fla. 3d DCA 2017). Florida also "follows the Restatement (Second) of Torts § 766 (1977) for [intentional interference] cause[s] of action." *Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So. 2d 1105, 1107 (Fla. 4th DCA 2000) (citing *Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 185 (Fla. 1998)). Section 766, in turn, cross-references sections 768–773. *See* Restatement (Second) of Torts § 766 cmt. a.

They are sold a bill of goods that Mr. Sussman's methods will relieve them of timeshare ownership and told to stop all payments as part of this process. *See supra* Part I.E.1.–5. But what they are told—and sign up for—is not what they get. *See supra* Part I.E.1.–5. Rather, the record reflects that no valid exit process for Westgate-owned timeshares is kick-started by an owner's non-payment. Indeed, just the opposite. Contrary to what owners are told, stopping payments does not effectuate a timeshare exit. *See supra* Part I.E.1.–5. Rather, Westgate acts to enforce the agreement. It sends notices of late payments, continues to send maintenance fee statements, and initiates foreclosure proceedings. *See supra* Part I.C. All of this, Mr. Sussman knows and has experienced. *See supra* Part I.B.–D. But he carries on, not altering his practices that he knows in advance "will be held to constitute an actionable breach." Restatement (Third) of the Law Governing Lawyers § 57 cmt. g. This makes his actions wrongful, not privileged. *See id.*

Mr. Sussman tries to sidestep liability by claiming that instructing owners to stop payments ultimately accomplishes the exit they signed up for because foreclosure means they no longer own the timeshare. (Doc. 206, pp. 9–10.) As he puts it, his actions are "justified" by Westgate's refusal to negotiate with him—in other words, Westgate's stance that owners must heed their contractual obligations.[12] (*Id.* at 9–10.) But when it comes to wrongful means—which negate asserted "justifications"—the "chief factor" is

---

[12] Mr. Sussman nestles this justification argument with his idea that the admitted fact only applies to owners who retain him directly, with whom he capitulates he has an attorney-client relationship. (Doc. 206, pp. 9–10.) The Court addresses this justification defense for all owners, as it goes to both Mr. Sussman's statuses as exit company agent and retained attorney.

the "nature of the actor's conduct." Restatement (Second) of Torts § 767 cmt. c. "The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing *it in the manner in which he does cause it.*" *Id.* (emphasis added). Put another way, the ends do *not* justify the means. So even accepting that Mr. Sussman sometimes makes a passing reference to foreclosure with some owners (*see* Doc. 207-8, ¶¶ 6–14 (Aviles)),[13] this hides the reality of what happens when owners attempt to exit a Westgate timeshare: foreclosure is the rule, not the exception; and Westgate can, and does, seek money judgments. (Doc. 185-11, pp. 1–38 (letters from Westgate to Mr. Sussman), 34 (Westgate letter responding to Mr. Sussman's form letter rejecting his demands and saying, "The owners identified in this letter will also be the subject of lawsuits should they choose to default as threatened in your letters. **My clients will seek money judgments, not foreclosures**.").) Moreover, owners are certainly not told that: (1) Westgate neither accepts nor recognizes Mr. Sussman's methods; (2) Westgate does not grant owners represented by Mr. Sussman deeds in lieu of foreclosure; and (3) Mr. Sussman has no control over Westgate's decision to foreclose. *See supra* Part I.E.1.–5. With this, Mr. Sussman's directions that owners stop payments are unjustified.

All in all, the record reflects that Mr. Sussman's directions that owners stop payments, made under the guise that doing so will rid them of their timeshares, are fraudulent and wrongful. Thus, Mr. Sussman is subject to personal liability for these

---

[13] When deposed, Mr. Sussman maintained that he tells owners Westgate doesn't accept anything and risks of foreclosure and possible litigation are present. (Doc. 185-2, pp. 104:12–105:2.) Mr. Aviles said he was told about the possibility of foreclosure, but not Mr. Coe. *See supra* Part I.E.4.–5.

statements and is not privileged as an agent for exit companies or as an attorney for individually retained clients. Nor are his directions justified because Westgate refuses to negotiate. So these first two lines of defense—agency/attorney privilege and justification—are rejected.

Next, still grasping at the lawyer cloak, Mr. Sussman contends his directions that owners stop paying and form demand letters are sheathed by Florida's litigation privilege and *Noerr-Pennington* immunity.[14] (Doc. 184, pp. 11–13.) Given this record, though, these defenses are quickly disposable.

Under Florida's litigation privilege, "absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves . . . tortious behavior . . . so long as the act has some relation to the proceeding." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire Ins.*, 639 So. 2d 606, 608 (Fla. 1994); *accord Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 384 (Fla. 2007). The privilege "arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto." *Fridovich v. Fridovich*, 598 So. 2d 65, 66 (Fla. 1992) (quoting *Ange v.*

---

[14] Mr. Sussman affirmatively asserts this defense in his motion for summary judgment on the belief that Westgate's tortious interference claim encompasses his demand letters. (Doc. 184, pp. 11–13.) As Westgate's motion makes plain though, its tortious interference claim is divided into two parts: (1) Mr. Sussman's directions that owners stop payments; and (2) Mr. Sussman's resignation and deeding methods. (Doc. 185, pp. 11–22.) Thus, Mr. Sussman's focus on the demand letters—on which essentially his litigation privilege and *Noerr-Pennington* immunity defenses rely—is inapposite. Nevertheless, the Court debunks them as raised by Mr. Sussman, for both his directions not to pay and his form letters.

*State*, 123 So. 916, 917 (Fla. 1929)). It's been applied to pre-suit communications required by statute or by contract as a condition precedent to suit, statements compelled by investigatory subpoena, and settlement negotiations aimed at concluding ongoing litigation. *Pledger v. Burnup & Sims, Inc.*, 432 So. 3d 1323, 1325–26 (Fla. 4th DCA 1983); *Fridovich*, 598 So. 2d at 69 n.7; *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1276 (11th Cir. 2004). It's been found inapplicable, however, to pre-suit letters sent prior to a complaint or even with a summons and complaint as a debt collection practice. *Trent v. Mort. Elec. Registration Sys., Inc.*, 618 F. Supp. 2d 1356, 1369 (M.D. Fla. 2007), *aff'd* 288 F. App'x 571 (11th Cir. 2008)[15] ("[T]his Court is unprepared to extend the litigation privilege to pre-suit communications especially where, as here, the parties agree that the law does not require that these notices be sent.").[16]

Mr. Sussman supposes that Florida's litigation privilege protects his conduct—his directions to owners to stop paying and the form demand letters he sends to Westgate. (Doc. 184, pp. 11–13; Doc. 206, p. 20). He tosses out *Trent* as support, saying, "In Florida, the litigation privilege has been applied to 'pre-suit communications,' like the 'demand letters' sent by [Mr.] Sussman." (Doc. 184, p. 11.) Wait, what? Ahem, as just recounted,

---

[15] While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

[16] In *North Star Capital Acquisitions, LLC v. Krig*, 611 F. Supp. 2d 1324 (M.D. Fla. 2009), Judge Corrigan expounded his stance in *Trent* in light of Florida's appellate court remand finding in *Echevarria* that Florida's litigation privilege did not apply to mortgage reinstatement letters. *Id.* at 1331 (citing *Cole v. Echevarria, McCalla, Raymer, Barrett & Frappier*, 965 So. 2d 1228, 1231 (Fla. 1st DCA 2007)). Judge Corrigan then ruled that Florida's litigation privilege did not extend to the pre-suit letters before him. *Id.* at 1332.

*Trent* expressly declined to extend Florida's litigation privilege to pre-suit letters, 618 F. Supp. 2d at 1360. So that's wrong. At any rate, Mr. Sussman's invocation of the litigation privilege is improper as he freely admits that "none of [his] agreements for timeshare cancellation work contemplate litigation, and they all say that in no uncertain terms." (Doc. 185-2, p. 223:19–21.) Rather, his "retainers state quite clearly that [he] will not represent [the owner] if there is a lawsuit"—there's another retainer for that, but he's never filed suit on behalf of a Westgate owner. (*Id.* at 77:20–78:18.) And, the sockdolager, he refers to his "thousands of thousands of files" as ones he "handled in a *non-litigation way*." (*Id.* at 190:10–19 (emphasis added).) So in no way is Mr. Sussman's conduct "necessarily preliminary" to litigation—indeed, his express aim is to *avoid* litigation because "if there is a lawsuit, [Mr. Sussman] would have to refund [the owners'] money in full because that is the terms of [his] retainer with them." (*Id.* at 78:12–14.)

Now, the Court need not just take Mr. Sussman's word for it. That his demand letters and conduct have no eye toward litigation is demonstrated by how Mr. Sussman handled the Aviles. *See supra* Part I.E.4. Once Mr. Sussman got wind of Westgate's lawsuit against the Aviles to recover their outstanding payments, he skedaddled. *See supra* Part I.E.4. He refunded their money, had them sign a settlement agreement to release all claims against him, and told them to lawyer up. *See supra* Part I.E.4. In the words of the settlement agreement, "Clients shall forthwith retain an attorney in Florida to represent them in connection with the matter entitled Westgate v. Aviles." (Doc. 123-6, p. 2, ¶ 1.) So, clear as day, the litigation privilege is inapplicable to Mr. Sussman. This defense is denied.

The same goes for Mr. Sussman's stretch for *Noerr-Pennington* immunity. Springing from First Amendment rights to assemble and petition government in the antitrust context, *Noerr-Pennington* immunity protects those who petition the government for official redress. *TEC Cogeneration Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1571–72 (11th Cir. 1996). This includes litigation and "those acts reasonably and normally attendant upon effective litigation," which can include "threats." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (quoting *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983)).[17] "If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *Id.* (quoting *Coastal States Mktg.*, 694 F.2d at 1367).

Mr. Sussman's directions that owners stop paying Westgate and related conduct bear no relation to the litigation process. Mr. Sussman's actions are not aimed at petitioning the government to redress aggrieved owners' rights; rather, he actively avoids judicial involvement through all of his work. As such, he cannot claim that what he does tallies conduct immunized by *Noerr-Pennington*—a doctrine notably birthed to protect "genuine effort[s] to influence legislation and law enforcement practices." *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 142 (1961). This defense fails.[18]

---

[17] The decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[18] Because Mr. Sussman's *Noerr-Pennington* defense fails at the first step, the Court need not reach Westgate's "sham exception" argument—which, as discussed *infra* note

With that fusillade of defenses and privileges eliminated, the Court concludes that the second disputed element is met: Mr. Sussman unjustifiably interfered with Westgate's contracts by directing the owners to stop payments. The Court now turns to the "imbedded" causation element, analyzing whether Mr. Sussman's conduct "caused or induced" the owners' breach. *See Chi. Title Ins.*, 832 So. 2d at 814 (citing *St. John's River Water Mgmt. Dist.*, 784 So. 2d at 504).

### c.    Causation

To defeat causation, Mr. Sussman raises two types of argument: (1) Westgate's owners are predisposed to breach; and (2) Mr. Sussman's interference did not proximately cause Westgate's claimed damages. (Docs. 184, pp. 8–10, 13–14; 206, pp. 10–14.) To the Court, the latter argument goes to whether Westgate has succeeded on the final element of damages, which we'll get to in a bit. *See infra* Part III.A.3. Right now, for this type of causation, the salient issue is predisposition, so the Court goes there. *See Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838–39 (Fla. 2nd DCA 2009); *Chi. Title Ins. Co.*, 832 So. 2d at 814.[19]

"Causation requires a plaintiff to 'prove that the defendant manifested a specific intent to interfere with [the contract].'" *Fiberglass Coatings, Inc.*, 16 So. 3d at 838 (quoting *Chi. Title Ins. Co.*, 832 So. 2d at 814). "No liability will attach unless it is established 'that

---

21, Mr. Sussman argues in the context of his deed back practices. (*See* Docs. 185, pp. 28–29; 207, pp. 19–21.)

[19] *See also Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. App'x 913, 915–16 (11th Cir. 2016); *Mortg. Now, Inc. v. Guaranteed Home Mortg. Co.*, 545 F. App'x 809, 811 (11th Cir. 2013).

the defendant intended to procure a breach of the contract.'" *Id.* (quoting *Chi. Title Ins. Co.*, 832 So. 2d at 814). "[I]f one party to a contract is already predisposed to breach, then the third party's actions cannot have induced the breach." *Mortg. Now, Inc.*, 545 F. App'x at 811 (citing *Farah*, 740 So. 2d at 561). Mr. Sussman submits that the owners he works for are predisposed to breach their contracts because they seek out timeshare cancellation services. (Docs. 184, pp. 8–10; 206, pp. 10–13.) So he didn't induce their breach—"[a]ll [he] did was advise [them]." (Doc. 184, p. 8.) This argument completely misses the mark.

Predisposition to breach means "that the breach by the party to the contract rather th[a]n the persuasion by the defendant was the proximate cause of the plaintiff's damage." *Farah*, 740 So. 2d at 561 (quoting 45 Am. Jur. 2d *Interference* § 10 (1999)).[20] According to Mr. Sussman, an owner's cogitations on whether it's possible to terminate his timeshare interest manifest an intent to breach his payment obligations. (Docs. 184, pp. 8–10; 206, pp. 10–14.) Nonsense. That each owner fielded Mr. Sussman's way signed up and paid for what they believed to be lawful cancellation services punctures this notion. *See supra* Part I.E.1.–5. If these owners really had intent to *breach*, i.e., believed they were no longer beholden to their ongoing and increasing fee obligations—Mr. Sussman would have never entered the picture. *See supra* Part I.E.1.–5. But, as the deposed owners testified, they agreed to his or an exit company's services on the promise of legitimate cancellation that wouldn't expose them to Westgate's wrath and its financial consequence. *See supra* Part I.E.1.–5.

---

[20] This section's number changed in the current edition. *See* 44B Am. Jur. 2d *Interference* § 12 (2019).

The record could not be clearer on this point. First, Ms. Day believed her timeshare would be sold as a means of exit but was very concerned when it came time to pay her maintenance fee statement because she wanted no negative consequences. *See supra* Part I.E.1. On Newton's express guarantee that it would timely pay, she did not pay. *See supra* Part I.E.1. Then, when Newton didn't fulfill its promise, she fought tooth and nail with them to get them to pay—which they eventually did. *See supra* Part I.E.1. From this, there's no shred of support for Mr. Sussman's contention that Ms. Day was predisposed to breach.

Same for Ms. Pfeil, who retained Reed Hein to cancel her timeshares. *See supra* Part I.E.2. She was told that her obligations could be cancelled by Reed Hein's work with a lawyer, but testified that if she knew foreclosure was in the cards based on non-payment, she wouldn't have readily agreed to its services as that's something she could have done herself by stopping payments and she likely would have kept paying to avoid foreclosure. *See supra* Part I.E.2. Similarly, Ms. Wenz, cold-called, signed up for JR's exit services upon being told that her timeshare could be transferred through quitclaim deeds. *See supra* Part I.E.3. When she received a fee statement, she called JR and asked whether she should pay based on where JR was in the process—she would go ahead and pay if need be. *See supra* Part I.E.3. JR, on consultation with its attorney, told her not to because it would disrupt the process. *See supra* Part I.E.3. So she didn't, but when time passed and nothing happened, Ms. Wenz asked for a refund to prevent further damage. *See supra* Part I.E.3. When she heard nothing from JR, she contacted Westgate to make it right. *See supra* Part I.E.3. So again, these owners' conduct displays no specific intent to breach their

contracts with Westgate by stopping payments absent instruction to do so as part of their cancellation process.

So too for Mr. Aviles and Mr. Coe, who retained Mr. Sussman directly. *See supra* Part I.E.4.–5. After experiencing a financial hardship, Mr. Aviles searched for timeshare cancellation services, landing on Mr. Sussman. *See supra* Part I.E.4. He e-mailed with "many questions" about the process; Mr. Sussman told him that if retained, Mr. Aviles wouldn't have to pay "another penny to the timeshare." (Doc. 137-6, p. 1); *supra* Part I.E.4. He decided not to retain Mr. Sussman then and kept making payments. *See supra* Part I.E.4. In September 2014, he reached back out to Mr. Sussman's office and was directed to discontinue all payments because "no more payments were necessary while Attorney Sussman's office took action to dispose of the timeshare." (Doc. 112-10, ¶ 8); *supra* Part I.E.4. He stopped payments as of September 14 and officially retained Mr. Sussman September 25; Mr. Sussman "promised that [the Aviles] would not be responsible for any missed note or maintenance fee payment and [they] would be able to 'walk away' free and clear." (Docs. 123-4, p. 9; 112-10, ¶¶ 6, 12); *see supra* Part I.E.4. So despite strained finances for at least a year, the Aviles didn't breach until Mr. Sussman came into the picture, evincing no predisposition.

Last, the Coes, who'd been put through the wringer trying to find a solution to their accrescent maintenance fees since 2010. *See supra* Part I.E.5. They'd tried contacting Westgate and selling through the secondary market, all the while staying current on payments. *See supra* Part I.E.5. When that didn't work, they hired an exit company, who directed them to stop paying fees. *See supra* Part I.E.5. That didn't work either, but Mr.

Coe happened upon an article touting Mr. Sussman's successful exit services. *See supra* Part I.E.5. He contacted Mr. Sussman's office who told him the exit method: negotiating away the timeshare obligations. *See supra* Part I.E.5. They eagerly signed up. *See supra* Part I.E.5. They wanted out because of maintenance fees, recognizing the obligation to pay. *See supra* Part I.E.5. Through all this, the Coes' conduct illustrates not a predisposition to breach but a concerted effort to find a legitimate way to terminate their timeshare. *See supra* Part I.E.5.

Given this record, the Court finds no support for Mr. Sussman's predisposition argument. Expressing displeasure with mounting payments and looking to exit does not amount to reneging on contractual obligations to pay. These owners felt ensnared precisely because they recognized their continually mounting contractual duties. They sought out services they believed would spring them from the trap, when instructed (directly from Mr. Sussman or via exit company), they stopped paying. *See supra* Part I.E.1.–5. So on this record, the Court finds the causation element met and Mr. Sussman's predisposition defense defeated.

That takes care of the first set of disputed elements for Westgate's tortious interference claim based on Mr. Sussman's direction that owners stop payments. To recap, the Court finds that Mr. Sussman's direction to stop payments amounts to intentional, unjustified, and non-privileged interference that induced owners to breach their contracts with Westgate. The final element—damages—will be addressed looking at Westgate's second claimed basis of interference—Mr. Sussman's resignation and deeding practices—because the damages element relates to both.

## 2.      Resignation and Deeding Methods

Beyond directing owners not to pay, Westgate raises Mr. Sussman's resignation and deeding methods as intentional interference with its contracts because these methods lead owners to continue non-payments on their belief that they have been relinquished from their timeshares.[21] (Doc. 185, pp. 13–18.) For his part, Mr. Sussman claims these practices are not fraudulent or deceptive, a response directed at Westgate's FDUPTA claim. (Docs. 184, pp. 16–24; 206, pp. 14–19.) No matter; the Court addresses whether these methods amount to tortious interference first.

Like before, there is no issue on the first two elements: Mr. Sussman readily admits he knows that owners have contractual obligations to continue paying Westgate and that any sale or transfer must comply with Westgate's Right of First Refusal. *See supra* Part I.B., D. And for the third element—whether employing these methods constitutes "intentional" interference—the Court finds this easily met because none comport with Westgate's approved exit process. *See supra* Part I.A. Because Mr. Sussman knows this and does it anyway, his use of these methods is intentional interference. *See supra* Part

---

[21] Although this isn't fleshed out in the record, the Court distinguishes the payments at issue for this second claimed tortious interference basis as those due *after* Mr. Sussman notifies owners, via letter, that due to his resignation and deeding methods, they are no longer obligated on their timeshares. *See supra* Part I.B., D. (letters accompanying deeds). All payments that owners miss during the pendency of Mr. Sussman's representation—starting with owners retaining him or an exit company until they are sent an exit letter—the Court puts in Westgate's "Cessation of Payments" pot. *See supra* Part III.A.1. This issue matters for the final damages element on this claim. *See infra* Part III.A.3.

I.B., D. That leaves the justification and privilege element and causation. Happily, this one's a sprint.

### a.    Resignation

First, Mr. Sussman's "resignation" method is sending a modified form letter notifying Westgate that the owner is resigning from the timeshare and the owner is prepared to execute a deed in lieu of foreclosure.[22] The letter ends with, "Should I not hear from you, in writing, within the next ten [10] days, I will assume that this letter is sufficient to effect resignation and withdrawal from your vacation club."[23] Westgate does not accept these Notices (Doc. 185-11, pp. 34–35); *see supra* Part I.C., and Mr. Sussman acknowledges they are ineffective for deed-based timeshares, like Westgate (Doc. 185-2, pp. 97:5–98:1). Untroubled by this detail, his office has used this method for Westgate (*id.* at 98:1, 208:12–210:23), and sent congratulations letters to owners based on these notices (Doc. 185-5). *See supra* Part I.B., D.

Now, Mr. Sussman offers no defense for this method, just that it's ineffective and he doesn't do it anymore so Westgate's claims can't proceed. (Docs. 184, p. 21; 206, p. 15.) But the record reflects Mr. Sussman used this method, knowing Westgate didn't accept it and it was ineffective. (*See* Doc. 185-5 (Mr. Sussman exit letters to Westgate owners for resignations)); *supra* Part I.B., D. He offers no justification or privilege for this method

---

[22] As this record doesn't actually contain a copy of a Notice of Resignation sent by Mr. Sussman, the Court cites one that Mr. Sussman sent to Westgate from the record in a companion case before the Undersigned. *Orange Lake Country Club, Inc. et al v. Reed Hein & Assocs.*, No. 6:17-cv-1542-Orl-37DCI (Doc. 224-9, pp. 11–13 (Nov. 8, 2018)).

[23] *Id.* at 13.

because there is none. At the same time, there is no evidence in the record that any of these owners stopped payments because of this method—only Mr. Sussman's letters to Westgate. (Doc. 185-5.) While it is tempting to infer that a congratulatory letter following "resignation" would induce future non-payment, there is no evidence of that fact. Without it, the Court cannot find this method induced owners to breach their contractual obligations, *i.e.*, the causal link. *See Fiberglass Coatings, Inc.*, 16 So. 3d at 838. So Westgate's claim of tortious interference based on Mr. Sussman's resignation method rests here, at the causation element. This doesn't mean Mr. Sussman's motion for summary judgment—to the extent it addresses this claim—is granted; rather both are denied. Westgate may elect to prove up this claim at trial (for both causation and damages), but this record doesn't support Westgate's summary judgment for the tortious interference claim on Mr. Sussman's resignation method beyond its initial elements.

### b.     *Deed to Associate*

Second, Mr. Sussman's deed to associates method, which Westgate asserts interferes with: (1) owners' payment obligations because it leads owners to believe they are no longer obligated; and (2) Westgate's Right of First Refusal.[24] (Doc. 185, pp. 14–19.)

For the former, Mr. Sussman points out that he tells associates who receive these deeds of the underlying payment obligations, so whether they actually pay is not his problem. (Doc. 212, pp. 3–4.) This skirts the issue though, which is whether owners who

---

[24] Despite the briefing histrionics, the Court pays no mind to Westgate's twaddle that this method amounts to a third-degree felony and Mr. Susman engages in a "large-scale criminal enterprise." (Docs. 184, pp. 14–19; 207, pp. 17–18.)

receive these deeds stop paying Westgate because they believe they are free. (*See* Doc. 185, pp. 14–19.) On that, the record again comes up short. It doesn't speak to how owners construed these deeds once received—all the Court has are Westgate's responses, Mr. Sussman's congratulations letter, and a deposition from one of Mr. Sussman's associates. (Doc. 206-1 (Terry Durst).) No doubt there is an inference that these might lead an owner to stop payment, but that's not enough. The owners deposed were issued deed backs to Westgate, and that's where the trail goes cold. *See supra* Parts I.E.1.–5.; (Doc. 206-2, p. 30:3–8.) So the Court cannot link Westgate's assertion that owners continued to breach their contractual obligations to pay to Mr. Sussman's deed to associate method. Westgate's bid for summary judgment on this ground is therefore denied; but, like before, Mr. Sussman's is too because an issue of fact remains as to the causal connection.

Westgate also claims that Mr. Sussman's use of this method amounts to tortious interference with its Right of First Refusal provision. (Doc. 185, pp. 14–19.) Mr. Sussman ripostes that this method is incontrovertible because his form letters state the owner is prepared to execute a deed in lieu to return the timeshare to Westgate, which in his mind complies with Westgate's Right of First Refusal. (Docs. 184, pp. 23–24; 204, pp. 16–17; *see also* Doc. 185-2, pp. 135:3–141:16); *supra* Part I.B., D.

A right of first refusal is "a right to elect to take specified property at the same price and on the same terms and conditions as those contained in a good faith offer *by a third party* if the owner manifests a willingness to accept the offer." *Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, 986 So. 2d 1279, 1285 (Fla. 2008) (emphasis added) (quoting *Pearson v. Fulton*, 497 So. 2d 898, 900 (Fla. 2nd DCA 1986)). In that vein,

Westgate's Right of First Refusal speaks to situations where an owner has a transfer agreement or buyer lined up, offer in hand, so Westgate can match the offer.[25] (Doc. 185-8, pp. 38–39); *see supra* Part I.A., C. It's not a return policy. As such, it has absolutely no application or relevance when Mr. Sussman sends his demand letter asking Westgate to take back its property—when, mind you, Mr. Sussman doesn't even know which exit method he'll employ. (Doc. 185-2, pp. 129:22–24, 273:12–18.) His stance otherwise confounds the essence of a right of first refusal. (*See id.* at 135:3–141:16); *see also Old Port Cove Holdings, Inc.*, 986 So. 2d at 1285. Saying it over and over again doesn't make it so. So that argument is rejected.

As the record reflects, Mr. Sussman deeds owners' timeshares to third parties without notifying Westgate in advance, as the Right of First Refusal requires. (Doc. 185-2, pp. 135:3–141:16); *supra* Part I.B., D. Westgate has unilaterally disavowed such deeds (Doc. 207-26, pp. 1–2), and sent individual responses seeking additional documents once notified of a recorded transfer (*id.* at 3–7). *See supra* Part I.C. Despite receipt, Mr. Sussman does nothing. (Doc. 185-2, pp. 140:14–18), *see supra* Part I.B., D. He ignores this obligation entirely and makes no effort to ensure the owners he represents comply. *See supra* Part I.B., D. As a wise man once said, he's entitled to his own opinion, but not his own facts.[26]

---

[25] *Cf. Old Port Cove Holdings, Inc. v. Old Port Cove Condo. Ass'n One, Inc.*, 986 So. 2d 1279, 1285 (Fla. 2008) (noting rights of first refusal "vary in form: some . . . allow the holder to purchase the property on the same terms as a third party" (citing *Shiver v. Benton*, 304 S.E.2d 903, 905 (Ga. 1983))).

[26] Senator Daniel Patrick Moynihan, "Everyone is entitled to his own opinion, but not to his own facts."

Such blatant disregard constitutes intentional, unjustified, and non-privileged interference with these owners' Right of First Refusal obligation.

Yet like above, this claim isn't fully established because Westgate hasn't demonstrated that Mr. Sussman's interference with the Right of First Refusal provision led owners to believe they were no longer obligated to Westgate or otherwise sealed their exit no matter how tempting that inferential leap. So again, the Court cannot tie Mr. Sussman's interference to Westgate's claimed breach on this record. Westgate's motion for summary judgment on this ground is denied, but Mr. Sussman's is too as the Court rejected his defense.

### c.   *Deed Backs*

Mercifully, last are Mr. Sussman's deeds back to Westgate that are claimed to interfere with its contractual rights for continuing payments and owners' beliefs they successfully exited. (Doc. 185, pp. 14–19.) Westgate cites its categorical rejection of such transfers, through various means including letters disavowing their validity, recording notices of non-acceptance in response, recording notices of non-compliance with its right of first refusal, and conveyances back, *see supra* Part I.C., as grounds to find Mr. Sussman's interference intentional, unjustified, and non-privileged. Mr. Sussman retorts that his method is kosher because acceptance of a deed and assent may be inferred by conduct, and acceptance is presumed when a deed benefits the grantee and imposes no burdens or duties on him. (Doc. 184, pp. 21–23 (citing *Riehl v. Bennett*, 142 So. 2d 761, 763 (Fla. 2d DCA 1962); *Smith v. Owens*, 108 So. 891 (1926); *Ellis v. Clark*, 23 So. 410 (1897).) Pure balderdash. Since day one, Mr. Sussman has experienced Westgate's refusal to "work

with anybody for any reason." (Doc. 185-2, pp. 53:18–54:13.) He developed his methods in spite of this knowledge—as he puts it, "it doesn't matter what you say to them or what you offer them. The answer is always the same." (*Id.* at 55:7–9.) So his defense of believing Westgate's conduct—or lack thereof—manifests assent to take back these timeshares is controverted by his own testimony. *See supra* Part I.B., D.

What's more, Westgate has consistently renounced Mr. Sussman's deed backs through its whack-a-mole tacks: letters, various recordings, transferring back title, and foreclosure. *See supra* Part I.C. Ironically, Mr. Sussman responds to Westgate's recorded conveyances back by stating, "Please be further advised that as a matter of law, acceptance by the grantee(s) requires that the grantee have an intention to take legal title to the property." (Doc. 185-13, p. 1); *supra* Part I.D. Again, impaled by his own sword.

Taking Mr. Sussman's acknowledgements and actions plus Westgate's various rejections and responses to the deed backs, the Court finds Mr. Sussman's continued practice of deed backs unjustified and non-privileged intentional interference.[27] On causation, here the record supports Westgate's contentions that these deed backs caused owners to believe they were successfully exited from their timeshares and all obligations

---

[27] As an affirmative defense, Mr. Sussman throws out that *Noerr-Pennington* immunity protects his deed back practices, quizzically reading Westgate's argument that *Noerr-Pennington* does not immunize Mr. Sussman's demand letters because these fall under the "sham" exception to apply to deed backs. (Doc. 207, pp. 19–21 (Mr. Sussman's response); Doc. 185, pp. 28–29 (Westgate's *Noerr-Pennington* argument).) In any event, Mr. Sussman's stretch of *Noerr-Pennington* immunity for his deed back practices is apropos of nothing—recording deeds is not petitioning the government for redress so does not fall under *Noerr-Pennington*'s wing. *See supra* Part A.1.b.

terminated—Ms. Day, Ms. Wenz, Mr. Aviles, and Mr. Coe all testified to that effect. *See supra* Part I.E.1., 3.–5.[28] Mr. Young also claimed he was contacted by eight or nine people who believed the deed backs effectively terminated their timeshare interest, and for what it's worth, even he understood the deeds he prepared were with the developer's consent. (Doc. 206-2, pp. 41:1–10, 63:18–64:14.) Which is why the owners were flummoxed when they later heard from Westgate they still owed money and were subject to foreclosure for non-payment. *See supra* Part I.E.1., 3., 4.

This record reflects that Mr. Sussman's recording and delivery of these deed backs to the owners, under the guise of "successful exit," was the crucial final step that led these owners to believe they were out of Westgate. *See supra* Part I.E.1., 3.–5. Through these deed backs, Mr. Sussman induced these owners' continued non-payments and ultimately implanted the conviction they had exited. *See supra* Part I.E.1., 3.–5. As if that weren't enough, with these congratulatory letters he instructed the owners that any further attempt to collect would be invalid. *See supra* Part I.D. With this, the Court finds that Mr. Sussman's deed back practice caused owners to continue breaching their payment obligations.

So, to recap, the Court finds that Westgate has established the first four elements and causation for its tortious interference claim based on Mr. Sussman's directions that owners stop paying; and Mr. Sussman's deed back method. Causation for the resignation

---

[28] Ms. Pfeil also signed a deed back to Westgate issued by Mr. Sussman but was foreclosed around the same time, so Mr. Sussman sent a congratulatory letter based on the foreclosure notice. *See supra* Part I.E.2.

and deed to associate method is not established. The Court will now turn to the final damages element for these two remaining pieces of Westgate's claim.

### 3.    Damages

The final element of a tortious interference with contracts claim asks what damages the plaintiff suffered as a result of the defendant's interference. *See Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 850–53 (11th Cir. 2017); *Mariscotti v. Merco Grp. at Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005). Whether the defendant proximately caused the plaintiff's asserted harm, as opposed to whether Mr. Sussman induced these owners' breach. *See supra* Part III.A.1.c., 2.b.; *compare Advantar Sys. Corp.*, 678 F. App'x at 850–53 (discussing causation aspect of damages element), *with St. Johns River Water Mgmt. Dist.*, 784 So. 2d at 504–05 (discussing imbedded causation element). Westgate proffered evidence that Mr. Sussman's interference caused loss amounting to $3,844,082, based on an expert report prepared by business evaluation expert Steven Wolf. (Doc. 185, p. 10 (citing Doc. 185-1).)

Mr. Wolf concluded that Mr. Sussman "deprived [Westgate] of $3,844,082 in unpaid mortgage and maintenance obligations." (Doc. 185, p. 10 (citing Doc. 185-1).) He arrived at this figure, not through an independent investigation, but rather on data Westgate provided on delinquent accounts for which it had a letter of representation from Mr. Sussman. (Doc. 185-1, p. 12, 12 n.6.) He segregated these accounts into four groups: (1) accounts delinquent after Westgate received a letter from Mr. Sussman; (2) accounts delinquent up to 90 days before Westgate received a letter from Mr. Sussman; (3) accounts delinquent over 90 days before Westgate received a letter from Mr. Sussman; and (4)

accounts with unknown letter or delinquency dates. (*Id.* at 17–18.) He discounted the latter group and arrived at 418 owners; Westgate now seeks damages for 411. (Doc. 185-1, p. 10, 10 n.1.) How it is that Mr. Wolf intends to connect these losses with those delinquent accounts that predate Mr. Sussman's appearance on the scene is something of a mystery.

The Court is unprepared to find Mr. Sussman's intentional interference—both in directing owners not to pay and deed back method—proximately caused all the damages calculated by Mr. Wolf. To get there, Westgate needs to fill in some gaps between Mr. Wolf's arithmetic and these owners' actions—for instance, what import does the 90-day mark have on these owners' payments? Nothing in the record suggests a link. Which method did Mr. Sussman employ for these 411 owners? As the Court noted, not all methods have borne fruit for Westgate's claims; some still need watering. And what about these total amounts—what chunk of payments goes in which bucket? Payments stopped at the beginning of Mr. Sussman's or an exit company's representation and throughout the process, could perhaps logically be attributed to an initial direction to stop payments. Not necessarily, though, for owners' *continued* non-payments at the back end of the process, depending on method and proof. On their face, Mr. Wolf's broad damages strokes based on information supplied by Westgate and Greenspoon Marder have gaping holes of "but for" causation no amount of advocacy or inferential leap can fill. So Westgate's summary judgment motion is denied in this respect, as is Mr. Sussman's.

All in all, triable issues remain on: (1) whether Mr. Sussman's resignation and deed to associate methods caused owners to cease payments and, if so, what damages can be attributed to that interference; and (2) what damages were caused by Mr. Sussman's instructions that owners stop payments and deed backs to Westgate. Because the Court finds Westgate established the first four elements—Mr. Sussman intentionally interfered with Westgate's contracts and this interference was unjustified and non-privileged—for the resignation and deed to associate methods, its summary judgment motion will be granted to this extent. By the same token, Westgate established the first four elements and imbedded causation element for its cessation of payment and deed back tortious interference claim, so its summary judgment motion will be granted to that extent.[29] In all other respects, for the tortious interference claim, Westgate's summary judgment motion is denied. Mr. Sussman's summary judgment motion is denied.

### B. FDUTPA

Recognizing that the only readers still engaged at this point are the firm's associates and perhaps, some day, a beleaguered Eleventh Circuit law clerk, the finish line's in sight. The Court turns now to Westgate's FDUTPA claim. FDUTPA prohibits "unfair or deceptive acts or practices" committed "in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). This claim has three elements: "(1) a deceptive act or

---

[29] Effectively, this partially grants Westgate's request to find certain facts established for trial (just the first one regarding Mr. Sussman's intentional and unjustified interference would apply here), but because the 411 owner number is tied up in Mr. Wolf's report, the Court will not cast its relief in Westgate's admitted fact terms. (Doc. 185, p. 4.)

unfair practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). "To satisfy the first element, the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016) (quoting *State, Office of the Att'y Gen v. Commerce Comm. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007)). Deception occurs if there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citing *Millenium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)). This is an objective test, i.e., "a party asserting a deceptive trade practice need not show actual reliance on the representation or omission at issue." *Id.*; *Commerce Comm. Leasing*, 946 So. 2d at 1258 (citation omitted).

Westgate insists, writ-large, Mr. Sussman's business is deceptive and unfair because it's built on the false premise that shirking contractual obligations creates a legal opportunity to negotiate away a timeshare. (Doc. 185, pp. 19–24.) When that inevitably fails, Mr. Sussman peddles another solution: resignation, deed backs, or deeds to associates. (Doc. 207, pp. 13–21.) And from the admitted facts, Mr. Sussman ropes in unwitting Florida attorneys to record these deeds with false representations of Westgate's consent to the transfer. (Doc. 128, pp. 11–12.) He also deeds to associates who "never intended to satisfy the payment of other obligations of ownership." (*Id.* at 11.)

The Court finds the first element is met: Mr. Sussman's business practice and three methods are deceptive. Mr. Sussman's "work," directly or via exit company, preys on owners helplessly ensnared by the Sisyphean obligations of their timeshare trap. *See supra* Part I.E. He promises a pain-free solution that will let owners walk away, without disclosing that Westgate rejects all of his solutions and will likely foreclose or sue the owner for outstanding obligations. *See supra* Part I.E. And when that happens, Mr. Sussman bolts. *See supra* Part I.E. To be sure, he'll offer a refund of his low fixed fee—for those who retained his services directly and are bold enough to ask. *Supra* Part I.E.4. Otherwise, he's arranged it so the exit company wrangles vexed owners. *See supra* Part I.B., D., E. For the bulk of Mr. Sussman's business conveniently operates behind the shell of these exit companies—that way, he's not on the hook when things end badly because his methods don't work. *See supra* Part I.B., D., E. He has set up his practice—down to the independent contractors, out-of-state attorneys, and associates who take deeds—to silo those involved and keep the information flow controlled. *See supra* Part I.B., D., E. Legerdemain for sure, but the jig is up.

Each method Mr. Sussman employs is likely to mislead reasonable Westgate owners to believe they are no longer contractually obligated on their timeshares. From the get-go, the record establishes Mr. Sussman touts his services as effective, no matter the developer, and immediately directs owners to stop paying because it will lead to successful exit. *See supra* Part I.E.1.–5. (Westgate owners). If an exit company is at the helm, it markets a cancellation strategy by working with an attorney—Mr. Sussman—to negotiate away the timeshare. *See supra* Part I.E.1.–3. (Ms. Day, Ms. Pfeil, and Ms. Wenz).

This indiscriminate approach misleads reasonable Westgate owners into thinking rescue is at hand from the seemingly inescapable snare of timeshare obligations. *See supra* Part I.E.1.–5. Not so. Thus, the Court finds Mr. Sussman's initial set up—directly telling Westgate owners that his methods, with or without exit companies, can successfully relieve them of their contractual obligations to Westgate—deceptive.

Similarly, Mr. Sussman's letters informing timeshare owners they successfully exited, regardless of method, are objectively deceptive given Westgate's nonacceptance. *See supra* Part I.C.

Thus, the Court finds that Westgate has satisfied the first element of its FDUTPA claim: that Mr. Sussman engages in deceptive practices by directing owners not to pay and carrying out his resignation and deeding methods, the latter of which involved Florida attorneys.[30] But causation is wanting. As before, factual issues surround Westgate's asserted harm. *See supra* Part III.A.3. Sure enough, Westgate has established that Mr. Sussman's business and methods were deceptive, but what remains is proof of the actual "injury or detriment to consumers," i.e., Westgate's owners, attributable to Mr. Sussman. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty. Inc.*, 169 So. 3d 164, 170 (Fla. 4th DCA 2015) (describing what an entity must prove to succeed on a FDUTPA claim); *cf. Stewart Agency, Inc. v. Arrigo Enters. Inc.*, 266 So. 3d 207, 213 (Fla. 4th DCA 2019) (noting proof required for "causation element of the damages claim"). The Court does not swallow, hook, line, and sinker, Mr. Wolf's valuations as Westgate's

---

[30] The Court finds no support for Westgate's claim based on Mr. Sussman's website advertisements. (Doc. 207, p. 16.)

actual damages, either in amount or attribution, to which FDUPTA limits recovery. *See Rollins, Inc v. Heller*, 454 So. 2d 580, 584–85 (Fla. 3d DCA 1984). So the causation and damages elements will proceed to trial, and both parties' motions are denied.[31] The potential remedy of injunctive relief will await proof at trial.

## IV.   CONCLUSION

The Weasel reneged on his promise. The Prey remains trapped in the snare. The Trapper is looking for bounty, we'll see if the jury gets there.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Plaintiffs' Motion for Summary Judgment (Doc. 185) is **GRANTED IN PART AND DENIED IN PART**:

---

[31] Mr. Sussman also asserts that Westgate's FDUPTA claim fails because: (1) he is not involved in trade or commerce; (2) he did not engage in solicitation; (3) his actions would only harm owners, not Westgate, (4) many owners do not reside in Florida; and (5) this action involves out-of-state entities. (Docs. 184, pp. 17–20; 206, p. 20.) The Court previously rejected these arguments when raised in Mr. Sussman's motion to dismiss (Doc. 40) and finds no merit to them here. Indeed, Mr. Sussman operates a business—his law firm—through which he retains clients to provide his "cancellation services." Unlike the lawyers in *Kelly v. Palmer, Reifler, & Assocs, P.A.*, 681 F. Supp. 2d 1356, 1372–77 (S.D. Fla. 2010), which Mr. Sussman cites, nothing performed by Mr. Sussman at-issue in this case was in pursuit of civil legal remedies. *See supra* Part III.A.1.b. Rather, his operation offers a service: for a fee, he'll get someone out of her time share. This constitutes "trade or commerce" under FDUTPA, Fla. Stat. § 501.203 (8), as both "providing" and "offering . . . any good or service," so Mr. Sussman's focus on "solicitation" is inapposite. And as an entity, Westgate can bring this claim. *Caribbean Cruise Line, Inc.*, 169 So. 3d at 170. Last, that this action involves out-of-state owners and entities does not place it outside FDUPTA's reach. *See Democratic Republic of the Congo v. Air Cap. Grp., LLC*, 614 F. App'x 460, 467–70 (11th Cir. 2015) (discussing FDUPTA's broad reach).

    a.     As discussed *supra* Part III.A.3., the Court **GRANTS** Plaintiffs' Motion to the extent Plaintiffs have proven certain elements of their tortious interference claim, Count I (Doc. 7, ¶¶ 90–100).

    b.     As discussed *supra* Part III.B., the Court **GRANTS** Plaintiffs' Motion to the extent Plaintiffs have proven Defendants' conduct constitutes deceptive trade practices for their FDUTPA claim, Count III (Doc. 7, ¶¶ 112–18).

    c.     In all other respects, Plaintiffs' Motion is **DENIED**.

2.    Defendants' Motion for Final Summary Judgment (Doc. 184) is **GRANTED IN PART AND DENIED IN PART**:

    a.     Pursuant to the parties' joint stipulation (Doc. 200), Defendants' Motion is **GRANTED** as to Count II of the Amended Complaint (Doc. 7, ¶¶ 101–11).

    b.     In all other respects, Defendants' Motion is **DENIED**.

3.    The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs on Count II (Doc. 7, ¶¶ 101–11).

4.    This matter will proceed to trial on all remaining issues.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on May 31, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record